Donna L. METZGER, Plaintiff,

v.

**CITY OF LEAWOOD and Leawood City Police Department, Defendants.**

**No. CIV.A.00–2015–KHV.**

United States District Court, D. Kansas.

April 20, 2001.

David R. Smith, Brendan J. Donelon, Michael R. Fletcher, Sanders, Simpson, Fletcher & Smith, L.C., Kansas City, MO, for Donna Metzger.

Cheryl Bloethe Linder, Morrison & Hecker L.L.P., Kansas City, MO, Rebecca S. Yocum, Morrison & Hecker, L.L.P., Overland Park, KS, Patricia A. Bennett, Office of City Atty., Leawood, KS, for Defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff alleges that her employer, the City of Leawood, Kansas, through its police department, discriminated against her on the basis of sex in violation of Title VII, 42 U.S.C. § 2000e et seq. The matter is before the Court on plaintiff's Motion For Leave To File Second Amended Petition And Supporting Suggestions (Doc. # 64) filed July 21, 2000; defendants' Motion To Dismiss (Doc # 43) filed June 2, 2000; Defendants' Motion For Summary Judgment (Doc. # 87) filed September 22, 2000; plaintiff's Motion For Reconsideration Of The Pretrial Order (Doc. # 99) filed November 8, 2000; defendants' informal motion to strike plaintiff's statement of uncontroverted facts in Defendant City Of Leawoods' Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 125) filed February 15, 2001; and Plaintiff's Motion For Leave To File Sur–Reply To Defendants' Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 128) filed March 6, 2001. For reasons stated below, the Court sustains defendants' motion for summary judgment in part, overrules defendants' motions to dismiss and to strike plaintiff's statement of facts, and sustains plaintiff's motions for reconsideration, to amend and to file a sur-reply.

## Factual Background

The following facts are either undisputed or, where disputed, construed in the light most favorable to plaintiff.

Plaintiff worked as a civilian employee at the Leawood police department for nine years, from June 15, 1987 through September 8, 1996. The Leawood Police Department consists of civilian employees and sworn officers. Civilian employees such as plaintiff work in the administrative division and sworn officers work in the patrol division. Each division is supervised by a captain. Periodically, the captains rotate. The administrative division consists of three departments: dispatch, records and the court clerk's office. Plaintiff originally worked as a dispatcher. Less than 18 months after she started work, defendants promoted her. Consequently, for the last seven years, from March 1989 to August 1996, plaintiff supervised the other dispatchers and served as senior communications officer. Plaintiff received excellent evaluations in her yearly performance reviews. Upon her initial employment, plaintiff received a copy of defendants' sexual harassment policy.

Before March 1989, Ronald Anderson, captain of the administrative services division, made plaintiff's workplace environment uncomfortable because he was having an affair with Sue Keller, who then served as senior communications officer and supervised plaintiff's work as a dispatcher.[1] Anderson supervised Keller and thus indirectly supervised plaintiff. During the affair, Anderson chastised plaintiff for disloyalty because she did not tell him that rumors about the affair were circulating throughout the department. He also issued plaintiff a letter of reprimand on the subject. Plaintiff complained about

---

1. The police department did not have a policy which prohibited affairs between supervisors and employees.

this admonishment to Stephen Cox, Chief of Police. Cox told plaintiff to not worry about the incident. Six months after the affair began, Keller left the police department. Plaintiff then filled Keller's position as senior communications officer and Anderson became her direct supervisor.

While Anderson supervised plaintiff, he made negative comments to her about taking sick leave to care for her child and not working overtime because she had child care difficulties. Anderson advised plaintiff that other employees might think plaintiff had a bad work ethic. Plaintiff does not know Anderson's policy on child care issues with regard to the other people he supervised or whether he treated her differently than other employees. Plaintiff told Anderson that she had a personality conflict with Rose Coleman, supervisor of court services. Anderson counseled plaintiff that the conflict was a "girl thing" and said that he did not like to supervise women. Anderson, along with Sidney Mitchell, Captain of Patrol, also reprimanded plaintiff for taking smoke breaks with Cox. Plaintiff made several verbal complaints to Cox about Anderson. In December 1994, plaintiff lodged a written complaint with Cox about Anderson's negative comments and generally hostile attitude toward women. Plaintiff began to document her complaints because she felt insecure in her job. The written complaint alleged that Anderson's comments and actions impaired plaintiff's employment and that he discriminated against her because she was

a new mother. Plaintiff documented 23 episodes which illustrated Anderson's lack of support for her as a supervisor and stated that Anderson harassed her due to her child care responsibilities.[2] Plaintiff's complaint did not contain the verbal complaints she had earlier made to Cox about Anderson.

Under defendants' policy, an employee can report possible harassment to an immediate supervisor, a department head or the human resources director. Following plaintiff's complaint, Cox rotated the captain positions so that Anderson oversaw patrol and ended his supervision of plaintiff. Cox told Anderson that he was making the switch because Anderson's goal was to retire as captain of patrol. Cox did not tell Anderson any other reason for the rotation, nor did he inform him of plaintiff's complaint, meet with him to discuss discrimination issues or reprimand him in any way. Moreover, in violation of city policy, Cox did not relay plaintiff's complaint to the human resources department for the city. Another employee, Shirley Whiles, told Anderson that plaintiff had instigated the transfer and planned to sue him for sex harassment. In any event, Mitchell became the new administrative services captain and supervised plaintiff. Cox told Mitchell about plaintiff's discrimination complaint. He asked Mitchell to not tell Anderson about it and to be alert for any impending problems that might occur if Anderson learned of the complaint.

**2.** Plaintiff's memorandum articulates a number of general concerns, to-wit: Anderson treated plaintiff more harshly because she declined to work overtime due to child care responsibilities; Anderson threatened to downgrade plaintiff's evaluation because she had taken off work to care for a sick child; Anderson did not make time to meet with plaintiff, attend communications department meetings, authorize supplies for the department, tell plaintiff when he was going to be out of the office, timely complete plaintiff's

evaluations, or give plaintiff advice on dealing with personnel issues; and Anderson expected plaintiff to tell him how she had dealt with personnel issues, threatened to deal with them harshly if plaintiff did not take care of them, and told plaintiff to take a soft approach with her unit but then would tell her to be more threatening. See Exhibit 1 to Exhibit B in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) filed January 16, 2001.

After Anderson's transfer, plaintiff encountered department-wide rumors that she was having an affair with Cox. Plaintiff and Cox had a close professional relationship but not a sexually intimate one. Plaintiff viewed Cox as a mentor. In the fall of 1995 through May of 1996, however, Cox led plaintiff to believe that he wanted a sexual relationship. In early fall of 1995, while he was having personal problems, Cox told plaintiff "I don't know what's wrong with me, maybe I should have an affair."[3] Plaintiff responded, "Well, maybe you should." Cox replied, "Would you like to volunteer?" Plaintiff laughed and told Cox, "You know, no, you're my Chief." Cox repeated this request twice: once during a smoke break while plaintiff was at work and again when plaintiff resigned on August 8, 1996. During the smoke break, Cox told plaintiff, "You know the offer still stands." Plaintiff responded, "What offer?" and Cox replied, "To have an affair." Plaintiff said, "No, I don't think so." Cox told her, "You know you hold my career in your hands right now." Plaintiff told him, "You don't need to worry about your job."[4] Plaintiff continued to think of Cox as a friend and felt that she could control the situation as long as Cox did not demand sexual favors.

Plaintiff had gallbladder surgery in January of 1996 and Cox visited her in the hospital and kissed her on the lips. Also in January of 1996, Cox insisted on taking plaintiff to the grocery store in bad weather when her husband was out of town. After the trip, he kissed plaintiff good-bye and she told him "Don't do this, please." Exhibit B in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 84–85. Plaintiff became uncomfortable because she felt that Cox wanted something in return for taking her to the store in bad weather. Cox also made plaintiff uncomfortable during this time period by holding her hand when he took plaintiff to lunch (and paid for their meals). After one of the lunch dates, Cox attempted to kiss plaintiff. In April or May of 1996, Cox and plaintiff met for a drink after work. Cox saw a portion of plaintiff's bra and remarked "God, I love your taste in bras." Exhibit B in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 81:24. This comment was the first overtly sexual remark that Cox had made toward plaintiff. Immediately after Cox made the comment, plaintiff told Cox that his requests for an affair and his comment about her bra made her uncomfortable. Cox did not make any other sexual comments or overtures until three months later, on the date plaintiff resigned, August 8, 1996. Other than the second overture about an affair during a smoke break, it does not appear that any of the incidents between plaintiff and Cox took place at work. Mitchell and Anderson believed that there was something more to the relationship between Cox and plaintiff, and they chastised plaintiff for taking smoke breaks with Cox and appearing to be too friendly with him. Anderson also downgraded plaintiff on one of her yearly evaluations because of her relationship with Cox. Department-wide rumors spread about the relationship between plaintiff and Cox. Cox took no steps to stop the rumors about the two of them.[5]

---

**3.** The record does not disclosure where this exchange took place.

**4.** The record does not disclose when this exchange took place.

**5.** Cox was aware of the rumors because Anderson had told him that his relationship with plaintiff was being discussed throughout the department. Exhibit G in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 14–15.

Cox did not follow plaintiff's suggestion that city employees, rather than outside contractors, perform janitorial work at the police station. This suggestion arose from an incident when the son of a contractor had entered the women's locker room and ejaculated on plaintiff's clothing.[6]

Plaintiff never reported Cox's behavior because she felt that she had the situation under control and that reporting Cox would jeopardize her career. Plaintiff believed that "[g]oing over the chief of police's head is putting your head on a chopping block as far as your career is concerned ... as long as I was able to keep him in check, I wasn't going to [Julie Hakan, the City's human resources director]." Exhibit B in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 82:19–23. In spite of Cox's behavior, plaintiff considered him a friend until the time of her resignation. In fact, she. invited Cox and his wife to her home so that their granddaughter could play with her daughter.

On May 28, 1996, plaintiff assisted in breathalyser training for the police department. Off-duty members of the police department volunteered to be test subjects for the training. The police department gave the participants specific amounts of alcoholic beverages and then performed dexterity and Intoxilyzer tests on the sub-jects. Some of the employees got quite intoxicated, becoming ill and behaving inappropriately. One female employee got drunk, became ill in the bathroom, then returned outside, put her head on Cox's feet and wrapped her arms around his ankles. Plaintiff stumbled in the parking lot and a police officer joked about her condition. Plaintiff made an obscene gesture to him.[7] Following this exercise, Mitchell met with plaintiff to discuss her behavior. Mitchell documented this meeting in a letter to plaintiff's file. According to the letter, Mitchell spent a good portion of the meeting chastising plaintiff for her relationship with Cox because he deemed it to be inappropriate and disruptive. Mitchell told plaintiff that others in the department resented and disliked her due to her relationship with Cox. He also told plaintiff that she should not take smoke breaks with Cox. Plaintiff responded that Cox was the one who asked her to go on the smoke breaks and that Mitchell had not seen the e-mails that Cox had sent her. Mitchell consulted Hakan before disciplining plaintiff. Hakan did not make any other recommendation, although she knew that plaintiff had been drinking during the incident and that it was not a smart idea to have supervisors or employees drink at work. The next day, June 6, 1996, Mitchell suspended plaintiff for one day because she had not behaved properly while intoxi-

---

**6.** One of plaintiff's supervisors, Sergeant Tayne Smith, told plaintiff that she should be flattered by the incident.

**7.** According to Mitchell, plaintiff also (1) asked an employee who had asthma and could not blow into the Intoxilyzer if that was the excuse she gave her boyfriend; (2) exposed an inappropriate amount of her legs and chest, to the point it became obvious to other participants that she was not wearing a bra; (3) discussed oral sex with another employee and said that a man should take off his watch because a woman's hair could get caught in the band and that a perfect gentle-man would hold a lady's hair back; (4) called one of her subordinates a bitch; (5) failed to cooperate with an officer and called him a prick; and (6) complained of the cold and remarked that she was "standing out here nippling." Plaintiff told Mitchell that she seldom drinks and that she had become very drunk at the training. Plaintiff also said that she could not remember most of the events of the afternoon. Mitchell felt that drunkenness was not an excuse. In addition, he did not believe that plaintiff had no memory of the afternoon, as she recalled certain events that had occurred.

cated.[8] The other female employee who had behaved poorly did not receive any punishment. In spite of this, while she was employed with defendants, plaintiff had no complaints about Mitchell.

During the investigation of the breathalyser incident, Hakan learned that people in the department believed that Cox and plaintiff were more than office buddies. Hakan also discovered that Mitchell thought that plaintiff flaunted her relationship with Cox and called him over to her house when her husband was out of town. Hakan filed a memorandum on June 6, 1996, stating that she would try to determine if the relationship between plaintiff and Cox was consensual.

On June 27, 1996, plaintiff testified at an administrative hearing regarding the termination of another employee, Rose Coleman. Defendants had terminated Coleman for falsifying payroll records. The police department employed three civilian supervisors: Coleman, who supervised the court clerk's office, Shirley Whiles, supervisor of records, and plaintiff. Anderson had supervised Coleman during part of her time at the police department. Coleman appealed her termination and the City held a hearing at which Whiles, who handled the police department payroll and maintained department records, testified about pay record discrepancies. Whiles had previously discussed the general subject of payroll fraud with plaintiff and asked for advice in dealing with the problem. During the course of the hearing, the City also examined allegations that plaintiff had improperly reviewed Coleman's performance evaluation and shared the evaluation with Whiles.[9] By mistake, Anderson had saved several employee evaluations in a public file on the computer network. Plaintiff claims that under the rules in defendants' employee handbook, it is appropriate at times for supervisors to view and discuss employee evaluations (including those of other supervisors) within their ranks.[10] Defendants dispute this interpretation of the policy but present no evidence in support of their interpretation. At her deposition plaintiff testified that she told Whiles about Anderson's error because Whiles was having problems with Anderson.[11]

Mitchell later asked Hakan to investigate the incident and find out how an employee's evaluation came to be publicly disseminated. Mitchell interviewed plaintiff, Whiles, Georgia Steenbergen and Jill

---

8. On the day Mitchell informed plaintiff of her suspension, Cox wrote plaintiff a letter which advised plaintiff to make amends with Mitchell. Cox speculated that "some of [Mitchell's animosity] may well be indirectly aimed at me ... I'm going to do my damnedest to set him straight about us." Exhibit 5 to Exhibit D in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119). Cox also stated that "I'm certain some of my actions have fostered a strained relationship between you and Sid." Id. Cox admitted that his actions toward plaintiff had caused her problems and strained her relationship with Mitchell, and that as a last gesture of friendship, would "fuck off."

9. The record does not disclose why this topic came up in the hearing. Prior to Coleman's

termination, however, plaintiff knew that Whiles was having difficulty with someone's payroll because she had talked to plaintiff about the possibility of payroll fraud and what action plaintiff thought Whiles should take with regard to her concerns.

10. The one page policy on rights of access to information lists types of documents on one side and individuals who are allowed access on the other. Across from the phrase "evaluation files" is the word "supervisors." Exhibit I in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119).

11. Defendants later terminated Whiles' employment for reasons which are not part of the record. Whiles was not punished, however, for her role in the Coleman incident.

Manson. Mitchell advised plaintiff and Whiles that failure to be truthful during the investigation could be cause for discipline, up to and including termination. Whiles testified that plaintiff had pulled up Coleman's evaluation on Whiles' computer screen. Steenbergen, an eyewitness, corroborated this testimony and reported that plaintiff had said "Look at this" as she pulled up a document on Whiles' screen. The eyewitness and Whiles said that as plaintiff pulled up the evaluation, she remarked "[e]njoy your reading." Manson said that Whiles told her that plaintiff had pulled up Coleman's evaluation on her computer. Plaintiff testified that she had merely sent Whiles an e-mail about the problem telling her where the evaluation was located, and may have said "happy reading," but that she did not send Whiles any files or pull up anything on Whiles' computer. The gist of the conflict in testimony was that plaintiff claimed that she had only sent Whiles an e-mail but Whiles claimed that plaintiff had pulled up the evaluation on her computer. Hakan investigated the possibility that plaintiff's e-mail existed by checking computer logs. Plaintiff considered the computer error in saving the evaluation to be a records issue. Whiles looked at Coleman's evaluation in spite of the fact that she believed it was wrong to look at another employee's evaluation.

At the Coleman hearing on June 27, Hakan learned for the first time that plaintiff had considered filing a sexual harassment suit against Anderson and that she had filed a written complaint about him with Cox.[12] On July 3, 1996, Cox wrote Hakan a memo about plaintiff's prior complaint about Anderson.[13] On July 12, 1996, Anderson met to discuss this disclosure with Hakan and Dick Garafano, City Manager. Anderson had previously heard rumors that plaintiff had considered a sexual harassment suit against him and that she in fact had asked other employees if they knew attorneys. This meeting, however, provided Anderson's first confirmation of that information. During the meeting, which was tape-recorded, Anderson told Hakan and Garafano that a sexual relationship between Cox and plaintiff seemed obvious, but that plaintiff's influence over Cox worried him more and he feared plaintiff was out to get him. He said "I'm scared to death of Donna" and "[Donna's] going to be real unhappy ... I think she's going to get me ... she's vindictive." Exhibit 9 to Exhibit D in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 10, 21. Anderson also confirmed that he had had an affair with Keller. When Anderson mentioned that it might be difficult for him and plaintiff to work together, Hakan asked him why he thought that plaintiff might not leave the police department before he did. Anderson asked why someone had not been punished for the Coleman incident and suggested that the parties involved take a lie detector test. Anderson told Hakan and Garafano that he had once "dinged" plaintiff on a performance review because of her relationship with Cox. Anderson thought that Cox had thrown him to the wolves to protect plaintiff. Following this meeting, Hakan recommended that Garafano meet with Cox to discuss the situation.[14]

---

**12.** The record does not disclose why this topic came up in the hearing.

**13.** He also stated that persons had exchanged off-color remarks with plaintiff "which like it or not is inherent with the territory."

**14.** She is not sure if the meeting ever occurred.

On July 15, 1996, three days after the meeting between Anderson, Hakan and Garafano, Hakan met with plaintiff to discuss her sexual harassment complaints against Anderson. At that meeting plaintiff told Hakan that she felt Anderson had harassed her in the past but that she had always been able to do her job and that it was no longer a problem since Anderson's supervisory role over her had ended. After the meeting, Hakan wrote a memo to recount what she had discussed with plaintiff. Plaintiff approved the memo. Following this meeting, plaintiff learned that Anderson had never learned about her earlier complaint. She then became dissatisfied with the way in which Cox had handled the matter. Plaintiff also found out that the City had only conducted one sexual harassment training workshop in 17 years. No training about gender discrimination had occurred during her employment. Cox bore responsibility for ensuring equal opportunities for women at the police department and stated in his deposition that the police department had a poor record of training its employees about gender-based discrimination. Cox stated that the department provided more training for dogs in the canine unit than discrimination training to protect women. Among the sworn officers, only one woman had ever achieved a rank above entry-level police officer.[15] During Cox's 17 years at the police department, five or six other women had filed harassment complaints but no one had been terminated for discrimination.[16]

After Anderson learned of plaintiff's disclosure, he spoke with Cox. Anderson was very angry with Cox because (1) Cox had not told him the real reason for terminating his supervision of plaintiff in 1994, and (2) Cox and Mitchell had not allowed him to assist in investigating the payroll record violations which had led to Coleman's termination. Cox sent Garafano an e-mail on July 18, 1996, which stated "I'm not going to let [Anderson] take a fall on this deal ... I'm ultimately responsible for all that goes on here." Exhibit C in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 177:6–9. According to plaintiff, this remark demonstrates that Cox was intent on saving Anderson from any negative repercussions of plaintiff's harassment complaint. At his deposition Cox could not remember the context in which he made the remark or whether it was in response to Coleman's falsification of payroll records or plaintiff's accusations of sexual harassment.[17] Cox did tell plaintiff, however, that Anderson had learned of her earlier complaint and that he was very angry.

15. That woman is no longer employed by the police department.

16. Laura Gibbs made one of those complaints in the early 1990s, after Jim Thomas, a sworn officer, had sent her sexual notes and sexually assaulted her. Thomas admitted the assault but Cox did not fire him, demand his gun, take a first hand role in the ensuing investigation, or file a report with the Johnson County District Attorney's office (as he believed he was required to do). The department does not dictate through a policy that perpetrators of sexual assault be fired, and Cox may have allowed Thomas to resign after the assault. The department did not conduct additional training to thwart future assaults. Another sworn officer, Tom Hogard, sexually harassed Karen Motsinger. The investigation confirmed that Hogard had made a degrading statement to Motsinger in front of others. Cox did not terminate Hogard, and he is unsure if he even suspended Hogard. Furthermore, department policy does not prohibit adultery or sexual relationships between supervisors and married employees. The record does not disclose which other employees were involved in complaints of sexual harassment.

17. This e-mail is referenced but not included in the record, and the Court cannot specifically determine the context in which the comment was made.

Following Mitchell's investigation of the Coleman hearing, but before Hakan completed her search of defendants' e-mail logs, Mitchell believed that plaintiff had lied in both the Coleman hearing and the internal investigation. As a result, he recommended her termination. Hakan concurred, based on plaintiff's failure to be truthful and the fact that she had improperly shared another employee's performance review. At the time of her recommendation, Hakan did not know how plaintiff had procured Coleman's evaluation and she was unaware that it was available in a public file folder on the computer system which all employees had access to. Hakan's department merely advises department heads whether they can or cannot discipline employees. Neither she nor Mitchell suggested that Whiles be punished or reprimanded in any way. On August 7, 1996, Hakan and Mitchell met with Cox and advised him of their recommendation to terminate plaintiff.[18]

A day later, on August 8, 1996, Cox gave plaintiff the option of resigning with two weeks pay or being fired for reviewing Coleman's performance evaluation, discussing it with another employee, and not being truthful during the hearing about pulling up the report on Whiles' computer. Hakan knew that Cox had issued this ultimatum but she did nothing to protect plaintiff. Defendants did not tell plaintiff the outcome of the Coleman investigation. At the time, Cox did not know whether plaintiff had sent Whiles an e-mail since

Hakan had not completed the e-mail log investigation. Cox based part of his decision on Steenberger's testimony, but Steenberger never saw Coleman's evaluation on Whiles' computer screen; she merely heard plaintiff and Whiles talking and saw plaintiff work at Whiles' computer.[19] Plaintiff insisted that she had done nothing wrong, but Cox told her that no matter what she said, she would be fired. Exhibit J in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. #119). Cox told plaintiff they were still investigating the conflicting testimony and if an e-mail was discovered as plaintiff alleged, she would still be fired for showing Coleman's evaluation to Shirley Whiles, and if no e-mail were found, she would be fired for lying. Cox told plaintiff that "they" would find something because she had stepped on too many toes. When plaintiff said that it was not right and that she would sue, Cox told her that she would only be hurting herself. Cox also repeated his offer to have an affair with plaintiff and said that since plaintiff no longer worked at the department nobody could say anything about it. In his deposition, Cox characterized the conclusion of plaintiff's employment as "constructive termination" and said that plaintiff was forced to resign.

During Cox's deposition, plaintiff's counsel asked him if plaintiff's testimony and While's testimony could be reconciled if plaintiff had sent Whiles an e-mail and then opened the e-mail on Whiles' computer. Cox replied "[y]eah, that's possible."[20]

---

**18.** Defense counsel sent a defendants a letter on September 24, 1996, regarding plaintiff's possible suit and noting that it appeared plaintiff did not know prior to sharing the evaluation that her actions had violated city policies.

**19.** Furthermore, Cox and Mitchell obtained Steenberger's testimony approximately one year after the incident had occurred. The

record does not disclose exactly when defendants took Steenberger's testimony or, for that matter, when plaintiff shared the evaluation information with Whiles.

**20.** In Cox's deposition, plaintiff's counsel suggested that plaintiff could have opened her *e-mail* to Whiles on Whiles' computer screen. Exhibit C in Appendix To Plaintiff's Response

Exhibit C in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 146:3. That scenario could be reconciled with the third-party eyewitness testimony, but plaintiff herself has never espoused it. Indeed it is directly contrary to plaintiff's testimony that she did not pull up anything on Whiles' computer.

Before plaintiff resigned, Cox wrote Hakan a memo which said that if Whiles had lied, "Shirley gets away unscathed and Donna has paid with her job." Exhibit 15 to Exhibit D in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119). Cox also wrote plaintiff a letter after her resignation stating that she had paid a big price for the Coleman incident and possibly their relationship and he hoped that she would forgive him.

Anderson did not have any input or participate in the decision to terminate plaintiff.[21]

Plaintiff tendered her resignation on August 8, 1996 with an effective date of September 8, 1996. Plaintiff stated that she was resigning to move to Iowa with her husband. At the time, plaintiff had no intention of moving, but in November 1996 she and her husband did so. After plaintiff's resignation, on September 18, 1996, Cox sent Hakan a letter which stated that there was bad blood between Anderson and plaintiff, likely because of Anderson's affair with Keller. He said that the quickest way for the police department to end

up in court would be for plaintiff to suspect that Anderson had been a catalyst for her constructive discharge. Cox noted, however, that he did not know if there was any cause and effect relationship at issue. Cox also sent plaintiff a letter which said that he had gotten the dry heaves after she left and that Mitchell and Anderson had both warned him that he was getting too close to her. He also said that Garafano knew he had mishandled the entire Coleman controversy. Cox admitted that he had done a thousand things wrong, but that it was now too late and plaintiff had paid the big price. He said that he wanted to remain her friend, but he could not do so if he had to spill his guts to her. Finally, Cox asked plaintiff to forgive him. Defendants received a letter from their attorney on September 24, 1996 stating that Cox's actions cost them money and would strengthen plaintiff's case, and that Cox should be punished.

### Procedural Background

On March 10, 1997, plaintiff filed a charge of discrimination with the Kansas Human Rights Commission ("KHRC"). Plaintiff said that she felt threatened in her position because of Anderson's attitude about attending to sick children and that she had complained to Cox about him; that Mitchell and Anderson had reprimanded her for taking smoke breaks with Cox; that defendants had harassed her due to her gender, subjected her to disparate treatment, and ultimately fired her for pursuing her rights; that Anderson

To Defendants' Motion For Summary Judgment (Doc. # 119) at 145–146.

**21.** Plaintiff does not cite any direct evidence to the contrary. She claims that Anderson must have been involved, however, citing circumstantial evidence such as the temporal proximity between the disclosure to Anderson and the constructive discharge; the fact that Cox was never absolutely certain that her version of the Coleman incident was false;

the meeting between Anderson, Hakan and Garafano regarding plaintiff's disclosure that she had considered filing a sexual harassment suit in 1994; Cox's comment that he would not let Anderson take the fall, that plaintiff had paid the big price and that she would be fired "no matter what;" and Cox's letter to Hakan that the quickest way to end up in court would be for plaintiff to think that Anderson had been involved in her termination.

learned of her earlier complaint when she gave testimony in an unrelated matter; and that after Anderson learned of the information, Cox gave plaintiff the ultimatum to either resign or be fired. Finally, plaintiff recited Cox's statement told her that "they" would find some reason to fire her. She later received a 300–day letter from the KHRC and a "Right to Sue" letter from the EEOC.

Plaintiff then filed her original complaint in the United States District Court for the Western District of Missouri. She filed her first amended complaint on February 25, 1999. The Western District of Missouri transferred the case to this Court and defendant filed its answer to plaintiff's complaint on January 12, 2000. Plaintiff's complaint alleges numerous incidents of sexual discrimination and harassment by Anderson, Mitchell and Cox throughout the course of her employment. Specifically, plaintiff alleges that defendants maintained a hostile work environment (Count I), engaged in disparate treatment and retaliated against plaintiff for filing a sexual harassment complaint (Count II),[22] and constructively discharged her from her employment (Count III).

Defendants argue that they are entitled to summary judgment on all claims which involve Anderson because plaintiff did not timely file discrimination charges as to him. They also contend that plaintiff did not exhaust her administrative remedies as to the hostile work environment and disparate treatment claims, since the EEOC charge only contained the date of plaintiff's termination and discussed Anderson's conduct. Defendants further assert that summary judgment is appropriate for Count I, plaintiff's hostile work environment claim, because (1) Anderson's pre 1994 conduct was not based on sex; (2) plaintiff did not believe that the harassment affected her

employment and the harassment was not severe or pervasive; and (3) plaintiff's suit is barred under *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), since defendants had a reasonable policy in place to prevent harassing behavior but plaintiff did not utilize it. Plaintiff responds that any incidents which involve Anderson's conduct outside the statutory period are actionable under the continuing violation doctrine, and that a reasonable EEOC investigation would have revealed her hostile work environment and disparate treatment claims. Moreover, plaintiff contends that defendants' harassment was based upon sex, that she felt that it affected her employment, that a reasonable person would have felt that her work environment was objectively abusive or hostile, and that the Faragher defense is not applicable because she suffered a tangible employment action.

Defendants assert that plaintiff's disparate treatment claims in Count II must fail because (1) plaintiff cannot establish a prima facie case since defendants did not treat similarly situated males differently than they treated her; and (2) defendants had legitimate nondiscriminatory reasons for their employment actions: they suspended plaintiff because she made an obscene gesture to a superior officer and they fired her because she lied during the Coleman hearing and subsequent internal investigation. Plaintiff responds that she does state a prima facie case since only women could have affairs with Cox, and that the stated reasons for any adverse employment actions are pretextual. Defendants contend that plaintiff's retaliation claim in Count II must fail because (1)

---

**22.** The heading of Count II is merely "retaliation," but plaintiff and defendants both treat it as including a disparate treatment claim. The Court therefore does likewise.

plaintiff has not engaged in any statutorily protected activity since discrimination did not prompt her 1994 complaints and the pretrial order does not contain her 1996 complaints; (2) the record does not reveal a causal connection between any protected activity and plaintiff's termination; and (3) defendants had a legitimate nondiscriminatory reason to terminate plaintiff: she improperly shared a supervisor's evaluation with another supervisor and lied about it in an internal investigation. Plaintiff contends that these reasons are pretextual.

Defendants argue that Count III, plaintiff's constructive discharge claim, must fail because plaintiff resigned and defendants did not terminate her. Plaintiff contests this characterization of her decision to resign.

In plaintiff's response to defendants' motion to dismiss, plaintiff adds 222 new statements of uncontroverted fact. In their reply brief, defendants argued that these statements do not comport with D. Kan. Rule 56.1 and should be stricken from the record. Plaintiff filed a motion for leave to file a sur-reply to defend her right to file these statements. See Plaintiff's Motion For Leave To File Sur–Reply To Defendants' Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 128) filed March 6, 2001. Defendants respond that their reply does not raise issues which warrant a sur-reply, that the sur-reply is unnecessary and will delay resolution of this matter, and that if plaintiff is allowed to file a sur-reply, defendants should get to file a sur-reply. See Defendants' Objections To Plaintiff's Motion For Leave To File Sur–Reply To Defendants' Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 129) filed March 13, 2001.

Finally, defendants contend that plaintiff waived her right to a jury trial since she has not served them with a separate jury demand.

In separate motions, plaintiff seeks leave to amend her complaint to add a claim under 42 U.S.C. § 1983 and also seeks reconsideration of the pretrial order. Defendants respond that plaintiff's motion to amend is untimely and unduly prejudicial, and that plaintiff's motion for reconsideration is without merit.

### Summary Judgment Analysis

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887,

891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment. See *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. See *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## I. Failure To Timely File Discrimination Charges Against Anderson

Timely filing of a charge with the EEOC is a prerequisite to suit under Title VII. See *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir.1996); see also *Nash v. Univ. of Kan. Med. Ctr.*, No. 97–2285, 1998 WL 230961 (D.Kan. April 14, 1998). To be in compliance, plaintiff must file an EEOC charge within 300 days of defendants' allegedly unlawful action. 42 U.S.C. § 2000e–5(e); see also *Harrell*, 957 F.Supp. at 1219. Thus it is essential that plaintiff's complaint allege discriminatory acts within the statutory period.

Defendants allege that all of plaintiff's discrimination claims as to Anderson are time-barred because they exclusively involve events which are outside the 300 day statute of limitations for EEOC/KHRC charges, i.e. (1) the actions in 1994 which precipitated plaintiff's complaint to Cox, and (2) his affair with Keller.[23] Plaintiff concedes that "examining Anderson's conduct in a vacuum" would lead to the conclusion that the pre 1995 allegations as to Anderson are time-barred.[24] She argues, however, that Anderson's conduct, coupled with that of Cox, constitutes a continuing violation which defeats the normal 300 day statutory limitation.[25] Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 118) at 49.

 The continuing violation doctrine permits a Title VII plaintiff to include allegations which occur outside the statutory time period if such incidents are sufficiently related to events within the limitations period, thereby constituting a continuing pattern of discrimination.

---

**23.** Defendants state that without the 1994 incidents, plaintiff would have no claim as to Anderson. Plaintiff does not allege that after 1994 Anderson continued to do what she had complained about in 1994. She does, however, cite incidents within the statutory period in which Anderson told plaintiff to not take smoke breaks with Cox because it looked improper, became angry with Cox, and allegedly intimated that plaintiff's employment should be terminated. Therefore plaintiff's claim as to Anderson is not solely based on events outside the 300 day period.

**24.** This concession is seemingly at odds with plaintiff's claim that Anderson engaged in acts within the 300 day period which are actionable under Title VII. On the other hand, plaintiff may be tacitly conceding that even if Anderson engaged in misconduct during the relevant period, it is not actionable under Title VII.

**25.** Plaintiff accurately points out that defendants only assert that Anderson's actions are time-barred and they make no argument as to any of Cox's actions. The Court therefore does not exclude any of Cox's actions outside the statutory period.

See *Mascheroni v. Bd. of Regents of Univ. of Cal.*, 28 F.3d 1554, 1560 (10th Cir.1994). The continuing violation doctrine "is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." *Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1415 n. 6 (10th Cir.1993). Plaintiff can establish a continuing violation by showing either (1) a series of related acts taken against her, one of which falls within the statutory time period; or (2) "the maintenance of a company-wide policy of discrimination both before and during the limitations period." *Benhardt v. Bd. of County Comm'rs of the County of Wyandotte*, 9 F.Supp.2d 1252, 1258 (D.Kan. 1998) (citations omitted). Though plaintiff states that the continuing violation doctrine allows all of her allegations to be incorporated, she does not specifically invoke either prong of the doctrine. She discusses the lack of gender discrimination awareness training and states that five or six other women lodged sexual harassment complaints while working for defendants. Her legal argument, however, addresses only the "related acts" prong. Under this prong, plaintiff must show that (1) at least one instance of the discriminatory practice occurred within the filing period; and (2) the earlier acts were part of a continuing policy or practice that includes the act or acts within the statutory period. *Id.* at 1415. To establish a continuing violation, plaintiff must identify a discriminatory practice that falls within the limitations period. See *Mascheroni*, 28 F.3d at 1561.

Plaintiff alleges the following incidents of discrimination within the statutory period: warnings by Mitchell and Anderson about plaintiff's relationship with Cox; Anderson's possible role in her constructive discharge; plaintiff's one-day suspension for the breathalyser incident; Cox's requests for an affair, Cox's holding of plaintiff's hand and Cox's comment on plaintiff's bra.[26] As noted above, the conduct which led to plaintiff's written complaint against Anderson is outside the statutory period, as is Anderson's affair with Keller. Plaintiff claims that in both respects, however, Anderson's earlier conduct is part of a continuing violation because it and Cox's relationship with plaintiff which occurred within the statutory period "relate to adulterous relationships in the workplace and attitudes toward women." Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 118) at 49. Defendants respond that since plaintiff failed to exhaust her administrative remedies for her hostile work environment claims, she cannot boot strap her time-barred allegations against Anderson onto the hostile work environment claims.

Having identified the material which is inside the statutory period, the Court must determine whether the earlier acts were part of a continuing practice that includes plaintiff's constructive discharge and Anderson's possible role in it, as well as the warnings by Mitchell and Anderson. The Tenth Circuit has adopted a three-part test to determine whether multiple acts of discrimination are related and therefore constitute a continuing pattern of discrimination. This test requires the Court to consider (1) the subject matter of

---

**26.** The Court assumes that the comments made by Mitchell and Anderson about plaintiff's relationship with Cox are within the statutory period, in spite of the fact that plaintiff does not provide any dates for them, because plaintiff's relationship with Cox did not become problematic until roughly the fall of 1995. Defendants argue that the only act by Anderson within the statutory period is his possible role in plaintiff's constructive discharge.

the alleged violations; (2) the frequency of the violations; and (3) the permanence of the violations.[27] See *Mascheroni,* 28 F.3d at 1561 (quoting *Martin,* 3 F.3d at 1415). No one factor, however, is decisive. See *Holmes v. Regents of Univ. of Colo.,* 176 F.3d 488, 1999 WL 285826, at *4 n. 3 (10th Cir. May 7, 1999).

## 1. Subject Matter

■■■] The subject matter prong of the continuing violation doctrine is not satisfied by merely stating that all the incidents of discrimination involve the same subject matter because they are all directed at women. Plaintiff must show that the type of discrimination outside the statutory period is the same as that within the time limitation. See Bailey, 941 F.Supp. at 1025 (subject matter prong met when all incidents involved sexual harassment of plaintiff); *Martin,* 3 F.3d at 1415 (same). Retaliation is a different type of discrimination than offensive comments and advances. See *Benhardt,* 9 F.Supp.2d at 1259. Under these standards, the Court concludes that plaintiff's claims outside the statutory period do not share subject matter with her claims inside the statutory period.

(a) Relationship between the conduct which precipitated the 1994 complaint against Anderson and his warnings about plaintiff's relationship with Cox

Plaintiff has not shown that the conduct which led to her written complaint against Anderson involves the same subject matter as his warnings to plaintiff about her relationship with Cox. Anderson's earlier behavior concerned his supervision of plaintiff's work. His later warnings about plaintiff's relationship with Cox were unrelated to that role or to the subject matter of plaintiff's earlier complaint. Plaintiff does not show any connection between the two subjects.

(b) Relationship between the conduct which precipitated the 1994 complaint against Anderson and plaintiff's constructive discharge (including Anderson's possible role in it)

Defendants argue that Anderson's role in the constructive discharge is unsupported by admissible evidence, purely speculative and wholly dissimilar to plaintiff's 1994 complaint. The conduct which precipitated plaintiff's written complaint against Anderson in 1994 consisted of allegations that Anderson had penalized plaintiff for child care responsibilities, failed to support her decisions as a supervisor and stated that he did not like working with women. If such conduct constituted discrimination, it related to a hostile work environment. On this record, Anderson's possible role in plaintiff's constructive discharge would be retaliation.[28] As mentioned above, retaliation is a different type of discrimination from offensive comment or disparate treatment, so the subject matter prong of the continuing violation test is not met for these allegations.

27. Plaintiff's response to defendants' motion is less than helpful as she merely states the related acts test and does not apply the specific criteria of subject matter, frequency and permanence. See Plaintiff's Response To Defendant's Motion For Summary Judgment (Doc. # 118) at 50. The mere assertion that none of her allegations should be barred since they all constitute evidence of a hostile environment at plaintiff's workplace does not suffice for application of this test.

28. For purposes of the continuing violation test, the Court considers plaintiff's allegation that Anderson participated in her constructive discharge. As discussed in the analysis of her retaliation claim, however, plaintiff does not provide evidence that Anderson personally instigated or otherwise participated in her constructive discharge.

(c) Relationship between the Anderson–Keller affair and Anderson's warnings to plaintiff about her relationship with Cox

Plaintiff has not shown that Anderson's affair with Keller involved the same subject matter as his warnings about plaintiff's relationship with Cox. In Benhardt, this Court analyzed alleged incidents of discrimination using such criteria as whether the incidents involved offensive comments or advances "directed to plaintiff individually" or "directed at an entire group of individuals." 9 F.Supp.2d at 1259. Although Anderson's affair with Keller and his later warnings to plaintiff share the theme of adulterous behavior, any harmful effects of Anderson's affair were shared by a group while Anderson's warnings to plaintiff were directed to her alone. Anderson's affair did not involve plaintiff in any way other than the fact she worked with him and Keller. Anderson did reprimand plaintiff for not telling him that her subordinates were gossiping about the affair, but the basis for the reprimand was a perceived lack of loyalty on plaintiff's part. Later, Anderson chastised plaintiff for maintaining a relationship with Cox which created the appearance of impropriety. Far from condoning a possible affair, as Anderson's relationship with Keller might have indicated, Anderson actively discouraged the association between plaintiff and Cox. Plaintiff has not demonstrated any subject matter relationship between Anderson's warnings to her and his own affair with Keller.

(d) Relationship between the Anderson–Keller affair and plaintiff's constructive discharge (including Anderson's possible role in it)

Plaintiff has not demonstrated any subject matter connection between Anderson's affair and her later constructive discharge. Defendants allegedly fired plaintiff because she had filed a complaint against Anderson in 1994. Even if Anderson's affair created a hostile work environment for plaintiff, retaliation is a different type of discrimination than a hostile working environment.

(e) Relationship between the Anderson–Keller affair and/or Anderson's conduct which precipitated plaintiff's 1994 complaint, and plaintiff's one day suspension

Plaintiff does not advance any argument that her one day suspension following the breathalyser incident bears any subject matter relationship to either Anderson's affair with Keller or the conduct which precipitated the 1994 complaint. The Court cannot find any similar subject matter between these events. Thus the subject matter prong of the continuing violation test is not met. (f) Relationship between the Anderson–Keller affair and/or Anderson's conduct which precipitated plaintiff's 1994 complaint, and Cox's actions and behavior toward plaintiff.

Anderson's affair with Keller and Cox's request for an affair with plaintiff present a closer case on the subject matter analysis. These events, however, are readily distinguishable. In and before 1989, Anderson had a consensual affair with another employee. In 1995 and 1996 Cox asked plaintiff on three occasions if she would like to have an affair. Though adultery or the prospect of adultery is present in both scenarios, they involve completely different actors, different time periods and different responses. For purposes of the continuing violation test, the relationships do not involve the same subject matter. The same is true of Anderson's pre–1994 behavior and Cox's dealings with plaintiff. Plaintiff does not allege that Cox failed to support her supervisory duties or chastised her for not working any overtime

because she had a child—the major subject of her complaints against Anderson.

### 2. Frequency Of The Violations

■] Plaintiff has not satisfied the frequency prong of the continuing violation test. Sporadic and unrelated incidents do not satisfy the frequency test. See *Stapp v. Overnite Transp. Co.*, 995 F.Supp. 1207, 1213 (D.Kan.1998) (five harassing comments in three years too sporadic to satisfy test).

Plaintiff alleges that Anderson and Keller had an affair in the late 1980s, that Anderson was not a supportive supervisor, that Anderson and Mitchell made comments about the appearance of impropriety in the relationship between Cox and plaintiff, that Mitchell subjected her to disparate discipline following the breathalyser incident, that Anderson may have had a role in her constructive discharge, and that Cox asked her to have an affair. In Holmes, the Tenth Circuit found that the plaintiff's list of 15 alleged discriminatory remarks and actions "presented a list of sporadic and varying employer actions, not frequently recurring instances of similar race or age-related discriminatory conduct." 1999 WL 285826, at *2–4. The Tenth Circuit has also held that observing one act of alleged harassment and hearing about another within the statutory period (a year after the harassment) constituted infrequent, isolated and discrete conduct that did "not rise to the level of a dogged pattern of discrimination." *Purrington v. Univ. of Utah*, 996 F.2d 1025, 1028–29 (10th Cir.1993). Like Holmes, plaintiff has outlined a relatively few varying, sporadic and completely unrelated employer actions over her seven year tenure with defendants. The same people did not repeat the same course of conduct into the statutory period, over the period of plaintiff's employment. Plaintiff's facts are wholly inadequate to satisfy the frequency prong of the continuing violation test.[29]

### 3. Permanence

■] The permanence prong of the continuing violation test asks "whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." *Benhardt*, 9 F.Supp.2d at 1260 (citing *Martin*, 3 F.3d at 1415).

The EEOC charge clearly states that plaintiff complained about Anderson's harassment and that Cox therefore removed Anderson from his role as plaintiff's supervisor. The fact that plaintiff filed a complaint with Cox establishes her awareness of the alleged harassing conduct. Plaintiff knew that she could complain to Cox again, if necessary. Plaintiff has not identified any permanent effect of Anderson's conduct that extended into the statutory time period. Therefore plaintiff has not satisfied the permanence prong of the continuing violation test for either Anderson's pre–1994 conduct or his affair with Keller. See also *Bullington v. United Air Lines*, 186 F.3d 1301, 1311 (10th Cir.1999) (complaint of sex discrimination to hiring personnel illustrated that plaintiff had sufficient notice to file claim and could not use continuing violation doctrine).

For all these reasons, Anderson's conduct before 1994, including his affair with Keller, is outside the statutory period and does not fall within the continuing violation exception to the statutory period for purposes of plaintiff's discrimination claims. The only claims as to Anderson that are

---

29. Plaintiff did not present any argument as to the frequency prong of the continuing violation test that included such information as when remarks were made, what they consisted of, who made them, and so forth.

within the statutory period are the warnings about plaintiff's relationship with Cox and the hypothetical role which he might have played in plaintiff's termination. Defendants are entitled to summary judgment on any claims as to Anderson's conduct which occurred outside the 300–day period of limitations.[30]

## II. Failure To Exhaust Administrative Remedies

■ Defendants argue that plaintiff failed to exhaust her administrative remedies with respect to any hostile work environment or disparate treatment claim because her EEOC charge relates only to the date of the constructive discharge and the conduct of Anderson that might have led to her discharge. See *Harrell v. Spangler, Inc.*, 957 F.Supp. 1215, 1219 (D.Kan.1997); *Gulley v. Orr*, 905 F.2d 1383, 1384 (10th Cir.1990). The exhaustion requirement serves two purposes: to give notice of the alleged violation to the respondent, and to give the EEOC an opportunity to conciliate the claim, effectuating Title VII's goal of securing voluntary compliance. See *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir.1994) (citations omitted). "Allowing a complaint to encompass allegations outside the ambit of the predicate charge would circumvent the administrative agency's investigatory and conciliatory role as well as deprive the charged party [of] notice of the charge." *Harrell*, 957 F.Supp. at 1219 (quoting *Jensen v. Board of County Comm'rs*, 636 F.Supp. 293, 298 (D.Kan.1986)).

Defendants assert that plaintiff's EEOC charge covers only the date and conduct surrounding plaintiff's constructive discharge and Anderson's alleged retaliation. Defendants conclude that plaintiff's hostile work environment and disparate treatment claims are therefore precluded for failure to exhaust. See Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment (Doc. # 88) filed September 22, 2000 at 15. Plaintiff argues that a liberal construction of her charge would lead to a conclusion that she sufficiently included Cox's conduct since she stated that Cox constructively terminated her and she makes a general allegation of hostile work environment due to gender. This factual account, plaintiff argues, sufficiently put defendants on notice that Cox's actions might be at issue in this matter.

As an initial matter, plaintiff's charge can be liberally construed to cover more than a claim for retaliation. It seeks relief under Title VII for "Hostile Environment, [R]etaliation and Constructive Discharge." Exhibit A in Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 118) filed January 16, 2001 at 4. In addition, it clearly states that plaintiff "was subjected to disparate treatment." Exhibit K in Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment (Doc. # 88) at 23. The Court therefore rejects defendants' arguments that plaintiff's charge precludes her hostile work environment and disparate treatment claims.

■ Defendants also argue that summary judgment is proper as to plaintiff's hostile work environment claim because the EEOC charge only discusses Anderson's conduct, and not that of Cox or any other member of the police department. The Court disagrees. Though defendants assert that plaintiff's EEOC charge implicates only Anderson, it explicitly names Mitchell. It does not allege any incident in which Cox treated plaintiff inappropriately, but allegations as to Cox may be included in plaintiff's lawsuit under Title VII if they are "reasonably related" to the allegations listed in the charge. *Ar-*

---

30. Such conduct is not necessarily inadmissible but it is not independently actionable.

*amburu v. Boeing,* 112 F.3d 1398, 1409 (10th Cir.1997) (citing *Brown v. Hartshorne Pub. Sch. Dist. No. 1,* 864 F.2d 680, 682 (10th Cir.1988)). "[C]onsideration of complaints not expressly included in an EEOC charge is appropriate where the conduct alleged would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made." *Martin,* 3 F.3d at 1416 n. 7.

Plaintiff's EEOC complaint asserts that sex discrimination tainted her career with the police department, that Cox told plaintiff that their "friendship" had prompted her constructive discharge, and that Anderson and Mitchell told plaintiff that her relationship with Cox gave the appearance of impropriety. A reasonable investigation would have necessarily examined the relationship between Cox and plaintiff and thereby uncovered Cox's three requests for an affair. Although plaintiff could have been more explicit in naming Cox, her EEOC charge contains sufficient allegations to support a Title VII hostile work environment claim as to Cox as well as Mitchell and Anderson (who are named participants in the EEOC charge), and as to plaintiff's disparate treatment claim.

### III. Count I: Hostile Work Environment Claim

In order to successfully state a hostile work environment claim under Title VII, plaintiff must show that (1) she is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. See *Bailey v. West,* 941 F.Supp. 1023, 1026 (D.Kan.1996); *Eichenwald v. Krigel's Inc.,* 908 F.Supp. 1531, 1539 (D.Kan.1995). Plaintiff must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with her work per-

formance or created an intimidating, hostile or offensive working environment. See *Martin,* 3 F.3d at 1418.

### A. Whether Alleged Harassment Was Based On Sex

Defendants argue that plaintiff's claim as to Anderson is barred because his 1994 comments were not sexual in nature or gender specific. In making this argument, defendants address Anderson's affair and the conduct which precipitated plaintiff's complaint in 1994. The Court has held that these matters are outside the statutory period and are not within the continuing violation exception to the statute of limitations. Defendants' argument is therefore moot.

### B. Effect Of Alleged Harassment On Plaintiff's Employment

In order to survive summary judgment, plaintiff must produce sufficient evidence to allow a reasonable jury to find that "(1) the alleged harassing conduct was severe or pervasive enough to create an objectively hostile or abusive work environment, and (2) plaintiff subjectively perceived the environment to be abusive." *Coker v. Ball Janitor Serv., Inc.,* 208 F.3d 225, 2000 WL 305487, at *4 (10th Cir. Mar.24, 2000) (citations omitted). Defendants first argue that plaintiff cannot meet the subjective prong of this test.

In order to prevail on the subjective component of this test, the law does not require a plaintiff to show that the discriminatorily abusive work environment seriously affected her psychological well-being, *Harris,* 510 U.S. at 22, 114 S.Ct. 367, or that it tangibly impaired her work performance, *id.* at 25, 114 S.Ct. 367 (Scalia, J., concurring). Likewise it does not require that she quit or wanted to quit the employment in question. *Davis v. U.S. Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998).

Defendants argue that plaintiff fails the subjective prong of the test because she has "steadfastly asserted that she was never unable to do her job because of any sexual intimidation, request, comment or innuendo ... and denied that her work environment was in any way affected by actions of Chief Cox." Defendant City Of Leawood's Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 125) filed February 15, 2001 at 29. Defendants emphasize that plaintiff considered Cox a friend up to the time of her forced resignation, voluntarily socialized with him and denied that his actions affected her work environment.

Plaintiff contends that she has demonstrated a genuine issue of material fact whether she subjectively considered her environment to be hostile and abusive. She told Cox that his comment about her bra made her uncomfortable, that his behavior made her "[s]exually uncomfortable" and that "[i]t was unwarranted, it was unwanted." Exhibit B in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 83:1–2. When Cox took plaintiff to the grocery store and kissed her good-bye, she told him "Don't do this, please." Exhibit B in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 84–85. Plaintiff was uncomfortable because she felt that Cox wanted something in return for taking her to the store in bad weather. Plaintiff did not report this or other behavior because "[g]oing over the chief of police's head is putting your head on a chopping block as far as your career is concerned ... as long as I was able to keep him in check, I wasn't going to [Hakan]." Id. at 82:19–23. This evidence creates a genuine issue of material fact whether plaintiff perceived her working environment to be abusive.

Under Davis, an employee need not quit her job or show that her work suffered in order to raise a triable issue of fact whether she perceived her work environment to be abusive. 142 F.3d at 1341. A genuine issue of material fact can be raised if the employee states that her workplace made her stressed out, that the she hated the harasser's behavior and that it shocked her, and that she wanted to avoid the situation. See id. at 1342; Coker, 2000 WL 305487, at *6 (similar facts to this case, but subjectively hostile work environment not found because plaintiff did not tell supervisor that advances were unwelcome).

Defendants also claim that their conduct was not severe or pervasive enough to create an objectively hostile or abusive work environment and that they are entitled to summary judgment on the objective prong of the test.[31]

This prong analyzes whether the severity or pervasiveness of the alleged harassment created an objectively hostile or abusive work environment. See Coker, 2000 WL 305487, at *4. Defendants argue that "casual or isolated manifestations of discriminatory conduct, such as a few sexual comments or slurs, may not support a cause of action." Memorandum Of Law In

---

31. Defendants' motion for summary judgment mainly discusses whether plaintiff subjectively perceived her environment to be abusive. Defendants' motion and reply brief, however, also seek summary judgment on the objective prong of the terms and conditions test. See Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment (Doc. # 88) at 2 ("there is no evidence of severe or pervasive conduct" and "[p]laintiff is unable to prove that the alleged harassment affected a term, condition or privilege of her employment."). Furthermore, defendants cite both prongs of the test in their analysis and state that "casual or isolated manifestations of discriminatory conduct ... may not support a cause of action." Id. at 20. Defendants' analysis of this issue is scarcely more than conclusory but the issue has been squarely raised and presented in shorthand fashion.

Support Of Defendants' Motion For Summary Judgment (Doc. # 88) at 20 (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir.1987)). The effect of the alleged discriminatory conduct on plaintiff's working environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The Court must consider whether "the harassing conduct [is] sufficiently severe [such] that a reasonable person would find the work environment hostile or abusive." *Smith v. Norwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir.1997).

Plaintiff alleges that the following events within the statutory time period made her environment objectively hostile or abusive: (1) Cox offered to have an affair with her three times; (2) Cox held plaintiff's hand when he took her to lunch two to three times a month between the fall of 1995 and May of 1996; (3) Cox kissed plaintiff on the lips on two occasions; (4) Cox pressured plaintiff to allow him to visit her when her husband was out of town and kissed her good-bye when he left her home; (5) Cox told plaintiff once at a bar after work that he loved her taste in bras; (6) defendants do not have a policy against supervisor/employee affairs; (7) Cox's actions toward plaintiff caused rumors at work and caused other employees to dislike her; (8) Mitchell and Anderson ad- monished plaintiff to stop taking smoke breaks and spending time with Cox because their relationship appeared to be improper; (9) Hakan knew about the rumored affair and did not ascertain whether it was consensual; and (10) Cox told plaintiff that their relationship likely caused her one-day suspension following the breathalyser incident.[32]

These incidents do not rise to the level of severity required to show an objectively hostile or abusive work environment. Plaintiff alleges that within a seven-month period, she encountered some 15 to 18 incidents of unwanted touching (hand-holding and two kisses), three offers for an affair, one inappropriate comment about her bra, an unfriendly atmosphere at work, and a one-day suspension. Plaintiff considered Cox's initial overture to be a joke and laughed it off without further repercussions. As plaintiff admitted, "That was the end of it at that point." Exhibit B in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 80:19–20. So far as the record reveals, Cox never attempted to force any of his attentions on plaintiff. He did not physically threaten or humiliate her. He was apparently a good sport about the fact that plaintiff declined to enter into an affair with him. He attached no employment consequences to her refusal to engage in a romantic relationship. When plaintiff expressed her discomfort with his conduct and comments, Cox mended his ways and apparently did not engage in further misconduct until the day of plaintiff's termination. Except for one proposition during a smoke break at the office, none of Cox's misconduct occurred

---

**32.** Plaintiff also mentions that other female employees had been sexually harassed and that a police officer had even sexually assaulted one employee. Plaintiff provides no concrete dates for these incidents, however, and the sexual assault is clearly outside the statutory time period since it occurred in the early 1990s. Plaintiff also argues that the very fact that Cox transferred Anderson to the patrol division supports her claim that Anderson had made her work environment abusive. As discussed above, however, Anderson's 1994 actions are time-barred. The Court does not consider these time-barred incidents.

in the workplace. The record contains no evidence that any of Cox's conduct interfered with plaintiff's work performance. At her deposition, plaintiff testified as follows:

Q: Did [Cox's conduct] interfere with your job performance?

A: No. He asked nothing of me—I mean, he never—because I wouldn't do what he asked me to do, never interfered in my job because he never approached me at work as far as making my job more difficult. He never put pressure on me at work as far as my work ethic went.

Exhibit B in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment at 83:1–12. According to plaintiff, the relationship "started to become a little uncomfortable" in January of 1996. Id. at 85:7–8. In April or May of 1996, when Cox made the comment about plaintiff's bra, "that was one of the very first times he actually put some type of sexual overtone to the whole situation." Id. at 81:20–25 and 82:1–5. Plaintiff immediately told Cox that the bra comment made her uncomfortable. He apologized, and never made another offensive comment until the date of plaintiff's termination.

Having considered the totality of the circumstances, the Court is satisfied that plaintiff's hostile work environment claim could not prevail before any reasonable jury. As a matter of law, Cox's conduct was not so severe or so pervasive as to create an objectively hostile or abusive work environment.

**C. Faragher And Burlington Industries Defense**

▮▮▮▮▮] Defendants argue that they are entitled to summary judgment on

Count I under *Faragher,* 524 U.S. 775, 118 S.Ct. 2275, and *Burlington Indus.,* 524 U.S. 742, 118 S.Ct. 2257, because they had a reasonable policy on sex discrimination, plaintiff did not take advantage of the policy, and plaintiff did not suffer a tangible employment action. See *Carney v. City of Shawnee,* 38 F.Supp.2d 905 (D.Kan.1999); *Cadena v. Pacesetter Corp.,* 30 F.Supp.2d 1333 (D.Kan.1998). When no tangible employment action has been taken, an employer has an affirmative defense to liability if it shows "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.,* 524 U.S. at 807, 118 S.Ct. 2275. Defendants must show that "(1) the harassment did not rise to the level of a tangible employment action; (2) [defendants] took reasonable care, as evidenced by [their] antiharassment policy, to prevent and correct promptly any sexually harassing behavior; and (3)[p]laintiff unreasonably failed to utilize the antiharassment policy." *Mallinson–Montague v. Pocrnick,* 224 F.3d 1224, 1228 (10th Cir.2000).

The existence of tangible employment action is critical, because Faragher attempts to shield employers from liability which arises from actions that can only be constructively attributed to them. *Desmarteau v. City of Wichita, Kan.,* 64 F.Supp.2d 1067, 1079 (D.Kan.1999). Faragher recognizes that tangible employment actions bring to bear the official power of the employing enterprise and require official acts of the employer.[33] Therefore, if

---

**33.** In most cases, tangible employment actions are documented in official company records and subject to review by higher level supervisors, and supervisors often must obtain the imprimatur of the enterprise and use

the alleged harasser "directly fired, demoted or reassigned the victim of harassment and that conduct formed part of the factual basis for the sexual harassment claim," the employer is fairly held liable and the Faragher defense is not available. *Dunegan v. City of Council Grove, Kansas Water Dept.*, 77 F.Supp.2d 1192, 1200 (D.Kan. 1999).

Plaintiff asserts that Faragher is not available because she suffered a tangible employment action: constructive discharge by her supervisor.[34] See Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 118) at 58. Defendants do not dispute plaintiff's characterization of her termination, but insist that it does not constitute a tangible employment action because it did not result from sexual harassment. See Defendant City Of Leawood's Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 125) at 29–30. Defendants, however, misconstrue both the law and the record.

Plaintiff argues that sex discrimination and retaliation prompted an investigation into her conduct concerning the Coleman matter, and precipitated the harsh outcome which followed that investigation. She states that her forced resignation is as close to termination as one can get under the constructive discharge analysis. If plaintiff proves this allegation, she will have established that defendants' misconduct culminated in a tangible employment action. The record is sufficient to create a genuine question of fact on this issue. Defendants are not entitled to summary judgment on the Faragher defense.

## IV. Count II: Disparate Treatment And Retaliation In Violation of Title VII

Disparate treatment and retaliation claims utilize the McDonnell Douglas burden-shifting methodology, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Shinwari v. Ratheon Aircraft Co.*, 215 F.3d 1337, 2000 WL 731782, at *8 (10th Cir. June 8, 2000); *Smith v. Board Of Public Util.*, 38 F.Supp.2d 1272, 1285–1287 (D.Kan.1999); *Benhardt*, 9 F.Supp.2d at 1261–63. Under the burden-shifting analysis, plaintiff first bears the burden of establishing a prima facie case of discrimination. If she sets forth facts to establish a prima facie case, the burden shifts to defendants to rebut the presumption of discrimination by articulating a legitimate nondiscriminatory reason for the adverse employment decision. See *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *EEOC v. Ackerman*, 956 F.2d 944, 947 (10th Cir.1992). "At the summary judgment stage, it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e. unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995). If plain-

---

its internal processes. *Desmarteau*, 64 F.Supp.2d at 1078–79. "When a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw upon his superior position over the people who report to him, or those under them, whereas an employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker." *Faragher*, 524 U.S. at 803, 118 S.Ct. 2275.

**34.** Plaintiff contends that defendants constructively discharged her when Cox told her that she must either resign or be fired. In support of this contention, plaintiff has submitted her affidavit and one from Cox which states that he "constructively terminated" her employment. Exhibit B at 71:16–20 and Exhibit C in Appendix To Plaintiff's Response To Defendant's Motion For Summary Judgment (Doc. # 119) at 120:4–6.

tiff makes out a prima facie case of discrimination and creates an issue of fact whether defendants' reasons are pretextual, plaintiff's claim withstands summary judgment. See *id.*

## A. Disparate Treatment Claims

Plaintiff claims that defendants treated her differently than male employees on two occasions: (1) when Mitchell suspended her for one day without pay following the breathalyser incident and (2) when Cox told her that she could resign or be fired due to the Coleman matter. See Plaintiff's Response To Defendant's Motion For Summary Judgment (Doc. # 119) at 60. Plaintiff may prove disparate treatment by using either direct or indirect proof of discrimination. If plaintiff relies upon indirect proof of disparate treatment, the Court applies the McDonnell Douglas burden-shifting analysis in discussing plaintiff's disparate treatment claim. Plaintiff does not contend that she has direct evidence of discrimination, so the Court applies the test for indirect evidence. As a first step, however, plaintiff must establish a prima facie case.[35]

## 1. Prima Facie Case: Suspension

▮▮▮▮▮▮] Plaintiff claims that her one day suspension following the breathalyser incident constitutes disparate discipline. Defendants argue that plaintiff cannot establish a prima facie case because she has not shown that they treated her differently from similarly situated males. A prima facie case of disparate discipline may be established by evidence that (1) plaintiff is in a protected class, (2) plaintiff was disciplined by the employer, and (3) the employer imposed the discipline under circumstances giving rise to an inference of discrimination. *Padilla v. State of Kan.,* 2000 WL 1466179, at *3 (D.Kan. Apr.7, 2000) (citing *Jones v. Denver Post Corp.,* 203 F.3d 748, 753 (10th Cir.2000)). The first two factors of the test are easily met: plaintiff is in a protected class due to her gender and defendants suspended her as punishment for misconduct at the breathalyser training. Plaintiff asserts that Mitchell suspended her because of her perceived relationship with Cox and that because only a woman could have an affair with Cox, the circumstances support an inference of discrimination. See Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 62. Defendants respond that plaintiff has not provided evidence that they treated similarly situated men more preferentially. See Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment (Doc. # 88) at 22.

Both positions are fraught with difficulty. The problem with plaintiff's claim is that she attempts to raise an inference of discrimination based on her alleged affair with Cox, not on her gender.[36] Plaintiff

---

**35.** The parties' analysis of plaintiff's disparate treatment claims is not useful, as they apply two different, but similarly incorrect, tests. See Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment (Doc. # 88) at 22 (applying *EEOC v. Flasher Co. Inc.,* 986 F.2d 1312 (10th Cir.1992) (disparate termination case), fourth prong of test rev'd as dicta, *Kendrick v. Penske Transp. Serv., Inc,* 220 F.3d 1220 (10th Cir.2000)); and Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 118) at 61 (applying *Cole v. Ruidoso Mun. Sch.,* 43 F.3d 1373, 1380 (10th Cir.1994) (disparate

demotion case), fourth prong of test rev'd as dicta, *EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184 (10th Cir.2000)).

**36.** Plaintiff cites Mitchell's letter to the file which indicates that when he met with plaintiff on the day before the suspension, he spent most of the time discussing his opinion that plaintiff's relationship with Cox was inappropriate and disruptive. According to plaintiff, the timing of this letter suggests that plaintiff's relationship with Cox played a role in Mitchell's decision to suspend her.

states that "[m]ale employees, and female employees not having alleged affairs, could not, and did not, suffer the same ramifications" as plaintiff. Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 118) at 63.[37] In other words, women who were having or regarded as having affairs were treated differently from (1) men who were having or regarded as having affairs and (2) women who were not having affairs or perceived to be doing so.

The problem with defendants' argument is that to establish a prima facie case, plaintiff is not required to show that defendants treated similarly situated males in a preferential manner. Proof that similarly situated males are treated in a preferential manner is one way to meet the third prong of the disparate discipline test but it is not necessarily the only way. See *Jones,* 203 F.3d at 753.

The Court nonetheless agrees that plaintiff has not raised an inference of discrimination which is sufficient to sustain a prima facie case on her suspension claim. Employees who are having affairs do not constitute a protected group for the purposes of Title VII discrimination claims. See *Taken v. Okla. Corp. Comm'n.,* 125 F.3d 1366, 1369–70 (10th Cir.1997) ("Title VII's reference to 'sex' means a class delineated by gender, rather than sexual affiliations"). The record in this case does not raise an inference of discrimination based on gender, as opposed to sexual affiliation. Indeed, the fact that defendants discipline one woman and not others for misconduct at the breathalyser training suggests that gender was not a motivating factor in their decision. Plaintiff has not established a prima facie case of disparate treatment with regard to the one-day sus-

pension and defendants' motion for summary judgment on this claim is sustained.

## 2. Prima Facie Case: Constructive Discharge

] Plaintiff claims that her forced resignation is actionable under a theory of disparate treatment. Defendants again argue that plaintiff cannot establish a prima facie case because she has not shown that defendants treated similarly situated male employees any differently. Plaintiff may establish her prima facie case by showing that (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge. See *Perry v. Woodward,* 199 F.3d 1126, 1135–39 (10th Cir.1999) (prima facie case met when plaintiff was member of minority group and qualified to perform job, and defendant terminated plaintiff but did not eliminate her job). By reason of her gender, plaintiff belongs to a protected class. Defendants present no argument that plaintiff was not qualified for her position and do not allege that her position was eliminated when she left the police department. Cox told plaintiff that she could resign or be fired, and later characterized the incident as "constructive termination." For the purposes of summary judgment, plaintiff has met her prima facie case.

## 3. Defendants' Rationale For Plaintiff's Discharge

 Since plaintiff has established a prima facie case for disparate termination with regard to her constructive discharge, defendants have the burden of production to rebut the presumption of discrimination by offering a legitimate nondiscriminatory

---

**37.** In support of this conclusion, plaintiff cites another female employee who got drunk, became ill in the bathroom and then laid her head on Cox's feet and wrapped her arms around his ankles.

reason for it. Defendants advance one reason for their decision to terminate plaintiff's employment: Mitchell believed that plaintiff had lied about the Coleman incident during the appeal hearing and the ensuing investigation. See Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment (Doc. # 88) at 23. Defendants do not need to prove that their nondiscriminatory reason is true or litigate the merits of their reason; they only need to provide a nondiscriminatory reason that is specific and clear. *Winkel v. Kennecott Holdings Corp.*, 242 F.3d 392, 2001 WL 23163, at *8 (10th Cir. Jan.10, 2001); *Palmer v. Leawood S. Country Club Inc.*, No. 97–2515–KHV, 1998 WL 724050, at *6 (D.Kan. Sept.9, 1998) (citing *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir.1992)). Defendants' proffered rationale is sufficient to meet their "sole burden at the second stage of the McDonnell Douglas analysis," which is to simply articulate a reason. See *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509–10, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff does not deny that defendants have satisfied their burden of production.

### 4. Plaintiff's Rebuttal

In order to defeat defendants' summary judgment motion, plaintiff must demonstrate a factual question whether defendants' articulated reason for her constructive discharge is a pretext for discrimination. To establish pretext, plaintiff must show either that "a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. "Plaintiff may accomplish this by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."

*Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1317 (10th Cir.1999). The Court notes, however, that the "plaintiff's mere conjecture that her employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Id.* (citing *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988) (quotations omitted)).

As noted above, defendants assert that they terminated her employment because she lied about the Coleman incident at the hearing and in the ensuing investigation. Plaintiff contends that she has established a genuine factual issue whether she lied, and whether this stated reason for termination is a pretext for discrimination.

In her deposition, plaintiff stated that she had sent Whiles an e-mail which alerted her to the fact that Coleman's evaluation had been saved in a public folder. Plaintiff claimed that she did not send the file itself to Whiles or pull anything up on Whiles' computer. Defendants claim that they did not believe her but that they believed Whiles, who testified that plaintiff had physically pulled up Coleman's evaluation on Whiles' computer and said, "Enjoy your reading." Two other employees, including one eyewitness, concurred in Whiles' version of events.

On this record, the mere possibility that plaintiff might have been telling the truth does not establish a genuine factual issue as to whether she lied or whether defendants' stated reason for termination is pretextual. See *Euerle–Wehle v. United Parcel Service, Inc.*, 181 F.3d 898, 900 (8th Cir.1999) (whether employee correctly concluded employee lied found immaterial because it acted reasonably and in good faith during its investigation); *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) (not sufficient for employee to show that employer acted incorrectly by firing

him; employee must show that employer did not honestly believe the reasons it gave for firing him); *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (fact that employees may have been "lying through their teeth" regarding allegations against plaintiff irrelevant, inquiry limited to whether supervisors believed plaintiff guilty of harassment, and if so, whether belief was reason for discharge). Aside from her own testimony, plaintiff cites no evidence that Whiles lied. Whiles' word, however, was corroborated by two other witnesses. The record contains no evidence that defendants believed plaintiff's testimony, or that they lacked a good faith belief that she had lied. Plaintiff's "mere conjecture that her employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Bullington,* 186 F.3d at 1317 (citing *Branson,* 853 F.2d at 772). Plaintiff is not entitled to present this issue to a jury on the sole hope that a jury will credit her testimony instead of the other witnesses. Defendants are entitled to summary judgment on plaintiff's claim that defendants' stated reason for termination—that she lied during the Coleman hearing and ensuing investigation—is a pretext for discrimination.

Plaintiff argues that even if the stated reasons are not false, discriminatory intent can be inferred from the following circumstantial evidence which is unrelated to the stated reasons for termination: (1) Cox's statement that because of their relationship, plaintiff would be fired no matter what; and (2) the fact that Whiles, who also looked at Coleman's evaluation, was not reprimanded or fired. This evidence is problematic for several reasons. First, even if Whiles violated city policy by looking at Coleman's evaluation, she is the same sex as plaintiff and defendants' failure to discipline her raises no inference of sex discrimination. Second, these facts at most suggest that defendants treated plaintiff differently because of her alleged affair with Cox, not because of her gender. As discussed above, romantic affiliations are not protected under Title VII. See *Taken,* 125 F.3d at 1369. Even if defendants really fired plaintiff because of her alleged affair with Cox, this does not establish the required showing of pretext. As long as the true reason is not a discriminatory one, it does not matter that defendants concealed it. See *Randle,* 69 F.3d at 451 n. 14.

In summary, plaintiff has not created an inference of pretext with regard to defendants' claim that they terminated her employment for lying. Defendants are entitled to summary judgment on plaintiff's disparate treatment claim regarding constructive discharge.

## B. Retaliation Claim

### 1. Prima Facie Case

Plaintiff asserts that Mitchell, Hakan, Cox and Anderson retaliated against her for complaining that Anderson's pre 1994 behavior constituted sex discrimination. Specifically, she claims that Mitchell, Hakan, Cox and Anderson were aware of her protected opposition to discrimination, that Anderson "had a hand in her termination," that Mitchell recommended her termination, that Hakan "concurred in her termination," and that Cox "lowered the ax." Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 118) at 72. Defendants argue that plaintiff fails to state a prima facie case since she has not engaged in any protected activity and that the record reveals no causal connection between any protected activity and plaintiff's termination.

To state a prima facie case of retaliation under Title VII, plaintiff must show that (1) she engaged in protected opposition to Title VII discrimination; (2)

she suffered an adverse employment action contemporaneous with or subsequent to such opposition; and (3) a casual connection links the protected activity and the adverse employment action. See *Penry*, 155 F.3d at 1263. Plaintiff can establish the causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. of Kan., Inc.*, 683 F.2d 339, 343 (10 Cir.1982).

### a. Protected Opposition

■■■ In order to establish that she engaged in protected activity under Title VII, plaintiff must show that she either participated in a Title VII investigation or opposed Title VII violations. See 42 U.S.C. § 2000e–3(a). Plaintiff contends that she opposed Title VII violations. See Memorandum Of Law In Support Of Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 118) at 68–69. The opposition clause "prohibits retaliation against an employee or applicant for employment because she 'opposed any practice made an unlawful employment practice'" by Title VII. *Brower v. Runyon*, 178 F.3d 1002, 1005 n. 3 (8th Cir.1999) (quoting 42 U.S.C. § 2000e 3(a)). Plaintiff must show that she based her actions upon a "good faith belief that Title VII[had] been violated." *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984) (citations omitted). In this regard, the Tenth Circuit requires only a subjective belief of a Title VII rights violation. See *Jeffries v. State of Kansas*, 147 F.3d 1220, 1231 (10th Cir.1998); *Love*, 738 F.2d at 385.

■■ Plaintiff argues that she opposed Title VII violations on three occasions: once in 1994, when she complained to Cox about Anderson, and twice in 1996: first, when she told Hakan during the Coleman hearing that Anderson had sexually harassed her, and later, when she discussed her accusation in a private meeting with Hakan.[38] As to plaintiff's first claim, harassment or discrimination based on gender can be implied in two of the 23 episodes which plaintiff included in her written complaint to Cox in 1994:(1) plaintiff's complaint that Anderson treated her more harshly because she declined to work overtime due to child care responsibilities, and (2) plaintiff's complaint that Anderson threatened to downgrade her evaluation because she had taken off work to care for a sick child. When she submitted her complaint, plaintiff also told Cox that she felt Anderson had discriminated against her because she was a new mother. Even if she was mistaken, plaintiff's complaints could support a claim that she had a good faith belief that defendants had committed sex discrimination in violation of Title VII. See *Shinwari*, 2000 WL 731782 at *6 (good faith belief shown when plaintiff alleged that defendant took responsibilities from older employee and said "younger leads" would be given presentation opportunity). The Court cannot find as a matter of law that plaintiff lacked a good faith belief that she opposed Title VII violations in 1994.

■■■■ Plaintiff also alleges that she opposed a Title VII violation twice in 1996, first when she made her disclosure during the Coleman hearing and then when she met with Hakan after the Coleman hear-

---

**38.** Plaintiff also asserts that she opposed Title VII violations when (1) Anderson heard the rumor in 1994 that plaintiff felt she had been discriminated against and inquired about attorneys; (2) Cox failed to relay plaintiff's complaint about Anderson to the human resources department; and (3) Cox told Hakan that plaintiff had made a complaint against Anderson in the past. Actions by other people, however, do not constitute opposition by plaintiff to Title VII violations. The Court therefore only analyzes the activities in which plaintiff herself engaged.

ing. As a preliminary matter, defendants argue that plaintiff cannot rely on these incidents because they are not included as statutorily protected activities in the pretrial order. The pretrial order supercedes all pleadings and controls the subsequent course of the case. See *Steil v. Humana Kansas City, Inc.*, 124 F.Supp.2d 660, 665 (D.Kan.2000) (citing Fed.R.Civ.P. 16(e) and D. Kan. Rule 16.2(c)). Regarding "issues of law," the pretrial order (Doc. # 98) makes one mention of a statutorily protected activity when it identifies the following issue: "Did plaintiff exercise a statutorily protected activity when she submitted her December 14, 1994 memorandum to Chief Cox regarding Ron Anderson?" The 1994 complaint, the Coleman hearing and the 1996 meeting with Hakan are all discussed, however, in the factual section of the pretrial order.

The Court need not decide whether the pretrial order forecloses plaintiff's position as to her allegedly protected activities in 1996, however, because plaintiff's position is not well taken on the merits. As a matter of law, plaintiff's disclosures at the Coleman hearing and her interview with Hakan in 1996 are not protected opposition to Title VII violations. As to the Coleman hearing, the only record evidence which even hints of protected opposition is the following exchange between plaintiff and an unknown questioner:

Q: In this memo to—there is a mention there is some fear of retaliation. Did you fear that you would be retaliated against by Captain Anderson?

A: I didn't fear retaliation so much as I've got better things to do in my life than to start keeping files on people. And I felt that's probably what I would have to end up doing.

Exhibit H in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 72:7–14. None of the other record evidence regarding the Coleman hearing concerns opposition to discrimination. The Court finds as a matter of law that this statement did not constitute protected opposition to alleged discrimination.

The other 1996 incident involved plaintiff's meeting with Hakan after the Coleman hearing. Plaintiff told Hakan that the problem with Anderson had been handled and that it "was no longer an issue." Exhibit 2 to Exhibit B in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119). In order to state a claim of retaliation based on opposition to Title VII violations, plaintiff must have had a good faith belief that she was opposing discrimination. Plaintiff could not have been opposing discrimination when, according to her statements, the discrimination had ended. Not every communication concerning possible discrimination is protected under Title VII. Cf. *Shinwari v. Raytheon Aircraft Co.*, 25 F.Supp.2d 1206, 1210–1211 (D.Kan. 1998) (informal complaint of discrimination to management not participation in Title VII investigation). Furthermore, plaintiff was merely informing others what she had considered discrimination in the past.

Both of the activities in 1996 might fairly be construed as participation in defendants' internal Title VII investigation. The participation clause, however, "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *EEOC v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir.2000) (participation clause did not include involvement in employer's internal investigation prior to filing EEOC charge); see also *Shinwari*, 2000 WL 731782, at *5 (internal complaints but no contact with EEO rep-

resentatives meant participation clause did not apply); *Tuthill v. Consolidated Rail Corp.*, 1997 WL 560603, at *4 (E.D.Pa. Aug. 26, 1997); *Laughlin v. Metro. Washington Airports Auth.*, 952 F.Supp. 1129, 1134 (E.D.Va.1997) (participation clause is narrower than opposition clause). Plaintiff does not make such an argument and if she did, it would be unavailing. As a matter of law on this record, plaintiff's remarks in 1996 do not constitute statutorily protected activity.[39]

### b. Adverse Employment Action

For purposes of this analysis, defendants do not deny that plaintiff suffered an adverse employment action in the form of a constructive discharge. The second factor of the retaliation test is therefore met for the purposes of this motion.

### c. Causal Connection

■■■■ The final element of plaintiff's prima facie case on retaliation is a causal connection between her protected activity and the adverse employment action. Temporal proximity alone is not always enough to support this element. Unless the employer's adverse action "is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999) (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997)). On one hand, the Tenth Circuit has held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. See *id.* (citing *Ramirez v. Okla. Dept. of Mental Health*, 41 F.3d 584,

596 (10th Cir.1994)). On the other hand, it has held that a three-month period, standing alone, is insufficient. See *id.* (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997)). Constructive discharge can support a retaliation claim, particularly if the actions leading to the constructive discharge are close in time to the protected opposition to Title VII violations. See *Sinclair v. Kmart Corp.*, 1996 WL 748038 (D.Kan.1996) (retaliation claim survived summary judgment when plaintiff resigned shortly after being told by supervisor that she would be fired if she reported sex discrimination).

In this case, defendants decided to terminate plaintiff's employment roughly 40 days after Mitchell, Hakan and Anderson first learned that plaintiff had filed a sex discrimination complaint against Anderson in 1994. Although Cox knew about plaintiff's complaint in 1994, it did not create any difficulties in his relationship with Anderson (or anyone else) until they learned about it in 1996. Anderson was angry with Cox and shortly after meeting with him, Cox gave plaintiff the option of being terminated (as Mitchell and Hakan had recommended) or resigning. When plaintiff insisted that she had done nothing to deserve termination, Cox told her that no matter what she said, she would be fired. See Exhibit J in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119).

Defendants assert that plaintiff has not adequately shown a causal connection because Anderson did not have any input or participate in the decision to terminate plaintiff's employment and plaintiff filed

---

**39.** Even if the Court had found that plaintiff's 1996 statements constituted statutorily protected activities, they would not advance her retaliation claim. Plaintiff cites no evidence that defendants retaliated against her because she told Hakan that Anderson's behavior was

no longer an issue and that the problem had been resolved in 1996. Plaintiff also cites no evidence that defendants retaliated against her because of what she said about the 1994 complaint at the Coleman hearing in 1996.

her complaint against Anderson two years before her constructive discharge.[40] The important date, however, is when Anderson and others learned of the complaint, not when plaintiff filed it. The record clearly supports an inference that in deciding to fire her, Mitchell, Hakan and Cox were motivated by knowledge that plaintiff had filed a sexual harassment complaint against Anderson and that Anderson was angry about the complaint and the manner in which Cox had handled

it. See Plaintiff's Response To Defendant's Motion For Summary Judgment (Doc. # 118) at 72–73. Viewing all of the evidence in the light most favorable to plaintiff, the record supports a reasonable inference that defendants retaliated against plaintiff because of her 1994 complaint against Anderson. See *Shinwari*, 2000 WL 731782, at *7. Plaintiff has established a prima facie case on her retaliation claim and defendants are not entitled to summary judgment on this issue.

**40.** Mitchell, Hakan and Cox provide affidavits that Anderson had nothing to do with the decision to terminate plaintiff. See Exhibit F ¶ 22, Exhibit D ¶ 14 and Exhibit G ¶ 5 in Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment (Doc. # 88). Plaintiff attempts to controvert these affidavits, citing the slimmest of circumstantial evidence that the affidavits are false. Specifically, plaintiff cites evidence that (1) Cox told plaintiff Anderson was angry after learning of her complaint; (2) Cox and Mitchell tried to shield Anderson from learning about plaintiff's complaint; (3) Cox vowed not to let Anderson take the fall; (4) Anderson feared that plaintiff was out to get him; (5) Anderson said that he could not work with plaintiff; (6) Anderson asked why people were not punished for the Coleman incident; (7) Anderson told Cox that he was angry; (8) Cox told plaintiff that she would be fired no matter what and that she had stepped on too many toes (presumably Anderson's); (9) Cox tried to discourage plaintiff from suing; (10) Cox said that the quickest way to end up in court would be for plaintiff to believe that Anderson had a hand in her termination; (11) defense counsel said Cox's termination would cost the City money, that his actions would strengthen plaintiff's case and he should be punished; and (12) Anderson met with Mitchell, Hakan and Cox before they decided to fire plaintiff and he could have influenced their decisions. Plaintiff's allegations do not create a *genuine issue of material fact as to* Anderson's involvement with the decision to fire plaintiff. In many respects, plaintiff mischaracterizes Anderson's testimony. For example, Anderson did not say that he could not work with plaintiff. At his tape-recorded hearing with Hakan and Garafano, he remarked "the obvious answer to the dilemma that we're in right now would be [for me to

not be there] causing problems because I'm going to be causing problems if I'm there simply by being there." Exhibit D in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 21. Later in the same meeting, Anderson and Hakan had the following exchange:

Anderson: I know Donna's not going to go and the Chief both [sic] are not going to go. I can't see, other than that I can't see any way . . .

Hakan: What makes you think Donna's not going to go?

Anderson: Well if she goes that still doesn't alleviate the problem that's been caused by her in so far as the, whatever Cox did to me and my working relationship with Mitchell which is paramount.

Also, plaintiff takes Anderson's testimony out of context. For example, Anderson asked about the Coleman evaluation incident:

Why was there no disciplinary action taken against those who started this whole incident? . . . Why not give them, if someone's interested in finding out why that happened [the dissemination of Coleman's evaluation], why not give them a polygraph test?

Exhibit D in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 9. Plaintiff *infers from* the fact that various individuals met with each other that they could have conspired to fire her. The meetings are undisputed, but plaintiff provides no evidence of any conspiracy that involved Anderson. The remainder of plaintiff's statements do not contradict the affidavits that Anderson had no role in the proposed termination. Viewing the record as a whole, the Court discerns no genuine issue of material fact whether Anderson participated in the decision to terminate plaintiff's employment.

## 2. Defendants' Rationale For Plaintiff's Constructive Discharge

Defendants have the burden of production to rebut the presumption of discrimination by offering a legitimate nondiscriminatory reason for plaintiff's constructive discharge. Defendants assert that they decided to terminate plaintiff's employment for two reasons: she improperly shared an employment evaluation with another supervisor, contrary to the city policy, and she lied about the incident during the Coleman hearing and the ensuing investigation. See Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment (Doc. #88) at 26. As discussed in regards to plaintiff's disparate treatment claims, defendants do not need to prove that their nondiscriminatory reason is true or litigate the merits of their reason; defendants only need to provide a nondiscriminatory reason that is specific and clear. See *Palmer,* 1998 WL 724050, at *6 (citing *Flasher Co.,* 986 F.2d at 1316). Plaintiff does not contest that defendants have met their burden of production.[41]

## 3. Plaintiff's Rebuttal

 In order to defeat defendants' summary judgment motion, plaintiff must demonstrate a factual question whether defendants' articulated reasons are pretext for discrimination. For reasons outlined above with respect to plaintiff's disparate treatment claim, the Court finds that plaintiff has not demonstrated a genuine issue of material fact as to defendants' claim that she lied. On this point, defendants' motion is sustained. Plaintiff has demonstrated a genuine issue whether defendants terminated her employment for violating city policy, however, and defendants' motion is overruled on that issue.

One stated reason for termination is that plaintiff violated city policy by looking at the evaluation of another supervisor and sharing it with a third supervisor. Plaintiff asserts that this reason is pretextual because defendants misinterpreted their employee handbook, which gave her the right to look at another supervisor's evaluation and discuss it with a third supervisor. See Exhibit I in Plaintiff's Response To Defendants' Motion For Summary Judg-

**41.** The Court notes the anomalous fact that in seeking summary judgment on plaintiff's disparate treatment termination claim, defendants' argument articulates only one legitimate nondiscriminatory reason: that plaintiff lied during the Coleman hearing and in the ensuing investigation. In seeking summary judgment on plaintiff's retaliation claim, defendants' argument asserts two legitimate nondiscriminatory reasons: that plaintiff lied, and that she violated city policy with regard to the Coleman evaluation. The pretrial order does not make any such fine distinction, but simply asserts that as of August 8, 1996, plaintiff's termination was "imminent due to her lying and the fact she had inappropriately shared another employee's evaluation." Pretrial Order (Doc. #98) at 10. In view of the summary judgment briefs, however, defendants have apparently waived any claim that plaintiff's violation of city policy constituted a legitimate nondiscriminatory reason for any disparate treatment related to plaintiff's ter-

mination. As to the retaliation claim, plaintiff has not demonstrated a genuine issue of material fact whether the statement that defendants fired plaintiff for her lying is a pretext for discrimination. She will attempt to prevail at trial, however, on her claim that defendants' assertion that she violated city policy is pretextual. Defendants will then be in a position to argue that even absent a pretextual firing based on a false allegation of a policy violation, they could and did fire plaintiff for lying. Under this approach, any pretext as to the policy violation would arguably be immaterial, except perhaps as to injunctive relief and attorney's fees. See 42 U.S.C. §§ 2000e–2(m) and 2000e–5(g)(2)(B)(i) and (ii) (when respondent demonstrates that it would have taken same action in absence of impermissible motivating factor, court may grant declaratory and injunctive relief and attorneys' fees, but shall not award damages or issue order requiring reinstatement, hiring or payment).

ment (Doc. # 118). The relevant inquiry, however, is not whether defendants' proffered reason is correct, but whether defendants "honestly believed those reasons and acted in good faith upon those beliefs." *Bullington,* 186 F.3d at 1318.

The one page policy on rights of access to information lists types of documents on one side and states who has access on the other. Across from the phrase "evaluation files" is the word "supervisors." Exhibit I in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119). From the written policy, it is not clear whether all supervisors can look at all evaluations (including those of fellow supervisors) or whether supervisors can look only at evaluations of those employees whom they supervise. Whiles apparently believed that the latter interpretation was correct and her interpretation has a certain logic to commend it. See Exhibit H in Appendix To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 119) at 11:3–13 (according to Whiles, policy does not allow supervisors to look at other evaluations by other supervisors). By the same token, while defendants assert that the policy does not support plaintiff's assertion, they provide no evidence whatsoever to support their contention. In this regard, plaintiff has demonstrated a genuine factual issue regarding the content of defendants' policy.

 A defendant's failure to follow its own written policy can be evidence of pretext. See *Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1168 (10th Cir.1998) (plaintiff can show defendant's reason for termination during reduction in force is pretextual if defendant did not follow own policy); *EEOC v. Kan. City Southern Ry.*

*Co.,* No. 99–2512, 2000 WL 1784138, at *4 (D.Kan. Nov.30, 2000) (plaintiff can show pretext with evidence that defendant acted contrary to unwritten policy or contrary to company practice when making adverse employment decision affecting plaintiff). At a minimum, plaintiff has provided evidence that defendants' policy is ambiguous and open to alternate interpretations. This evidence must be considered in light of the facts that plaintiff was a nine-year employee with no performance problems; that defendants decided to fire her immediately after Anderson learned about plaintiff's testimony at the Coleman hearing and reacted angrily to it; and that plaintiff's alleged policy violation was relatively trivial. The record raises a genuine issue of material fact whether defendants honestly believed in their interpretation of the policy, or whether their interpretation was pretextual.

## V. Count III: Constructive Discharge In Violation Of Title VII

 Plaintiff contends that defendants constructively discharged her in violation of Title VII because Mitchell, Anderson and Hakan believed that the relationship between Cox and plaintiff was inappropriate and they made her work environment hostile due to that relationship.[42] Defendants argue that plaintiff resigned because she knew she was about to be terminated for city rule violations, not because of a hostile work environment. An employee who is not formally discharged from employment may still be constructively discharged if the employer, by its illegal discriminatory acts, has made working conditions so difficult that a reasonable person in plaintiff's position would feel compelled to resign. See

---

**42.** This claim is apparently brought under Title VII, since the pretrial order states that the Court has federal question jurisdiction, 28 U.S.C. § 1331, due to plaintiff's claims under Title VII, and plaintiff states that she brings all claims pursuant to Title VII. See Pretrial Order (Doc. # 98) at 6.

*Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986); *Ulrich v. K–Mart Corp.*, 858 F.Supp. 1087, 1093 (D.Kan.1994). Plaintiff's own assessment of the working conditions, standing alone, generally "is insufficient to create a factual question for the jury as to whether a constructive discharge occurred. The test for constructive discharge is an objective one." *Ulrich*, 858 F.Supp. at 1093.

■■■ Plaintiff states that Cox gave her the choice to resign or be terminated. Defendants maintain that a claim for constructive discharge is not available when plaintiff is faced with a choice between resigning or being fired. See Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment (Doc. # 88) at 24. In this Circuit, however, it is clear that "an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired." *Burks v. Okla. Pub. Co.*, 81 F.3d 975, 978 (10th Cir.1996) (citations omitted).

Defendants also contend that plaintiff resigned because she knew that she was about to be terminated for violating the city policy and that she did not resign because of a hostile work environment. When plaintiff protested that she did not violate city policy, however, Cox told her that she would be terminated on some other ground, no matter what she did. A jury could find that given the prospect of imminent termination, a reasonable person in plaintiff's position would have felt compelled to resign instead of waiting to be fired. This case is similar to *Spulak v. K Mart Corp.*, 894 F.2d 1150 (10th Cir.1990), in which plaintiff's supervisor threatened

him with termination for minor rule infractions and told him that even if he could not be discharged for those infractions, his supervisor would find another reason to fire him. *Id.* at 1154 (jury verdict for plaintiff on constructive discharge claim upheld).

Defendants are not entitled to summary judgment on plaintiff's constructive discharge claim. See *Healion v. Great–West Life Assur. Co.*, 830 F.Supp. 1372, (D.Colo. 1993) (whether employee resigned or was terminated is question of fact for jury).

## VI. Right To Jury Trial

■■■ Defendants assert that plaintiff has waived her right to a jury trial because she has not filed anything which states "jury trial is demanded." [43] Defendant City Of Leawood's Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 125) at 35. The Tenth Circuit has advised that a request for jury trial should be granted in the absence of "strong and compelling reasons to the contrary." *Goff v. Owen Healthcare, Inc.*, 166 F.R.D. 492, 494 (D.Kan.1996) (citation omitted). In order to preserve a right to a jury trial, however, the party must make a timely demand. See *Christenson v. Diversified Builders Inc.*, 331 F.2d 992, 994 (10th Cir.1964). The Federal Rules of Civil Procedure provide that demand is automatically waived if it is not made within ten days of the service of the last pleading. Fed.R.Civ.P. 38(b).

Plaintiff argues that she timely demanded a jury trial on all issues because her complaint expressly requests judgment

---

**43.** Typically whether a case will be tried to the Court or to a jury is decided at the final pretrial conference. See D. Kan. Rule 16.2(b)(9). In this case, however, the parties delayed that decision since they planned to address it through the summary judgment process and the pretrial order (Doc. # 98) states that the case will tried either to the Court or to a jury. See Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment (Doc. # 88) at 14 n. 1.

pursuant to jury verdict on all three counts. See First Amended Complaint (Doc. # 25) filed February 25, 1999 at 9.[44] Under Rule 38(b), Fed.R.Civ.P., "[a]ny party may demand a trial by jury of any issue triable of right by a jury by (1) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue, and (2) filing the demand as required by Rule 5(d). Such demand may be indorsed upon a pleading of the party." While it is not desirable to bury the demand in the text of the pleading, plaintiff is correct in stating that demand may be incorporated in a pleading. See *Chemical Bank v. Affiliated FM Ins. Co.*, 1994 WL 719681 (S.D.N.Y. Dec.28, 1994) (citations and quotations omitted). Plaintiff's jury demand might have been made in a more obvious fashion or by a separate document, but it is sufficient to preserve plaintiff's right to a jury trial on her substantive claims.

### VII. Motion To Reconsider Pretrial Order

 Magistrate Judge Waxse held the final pretrial conference on September 5, 2000. Plaintiff filed objections to the proposed pretrial order on September 8, 2000. See Plaintiff's Objections To The Pretrial Order (Doc. # 84). Judge Waxse overruled those objections on October 30, 2000, see Order (Doc. # 96), and plaintiff filed a motion for reconsideration in this Court. See Motion For Reconsideration Of The

Pretrial Order (Doc. # 99) filed November 8, 2000. Defendants respond that plaintiff's motion for reconsideration is without merit.

Plaintiff objects that the pretrial order lists her 1994 complaint against Anderson as the only statutorily protected activity which is implicated in her retaliation claim. Order (Doc. # 98) at 14. Plaintiff asserts that her testimony at the Coleman hearing and her meeting with Hakan grew out of the 1994 incident, and that these events should therefore be specifically identified and included. See Motion For Reconsideration Of The Pretrial Order (Doc. # 99) at 3. Plaintiff contends that the same statutorily protected activity is at the heart of the three incidents, and that the only point of distinction is that defendants learned the information at different times. The pretrial order (Doc. # 98) does contain the above details in plaintiff's factual contentions.

Under D. Kan. Rule 72.1.4, the procedure for filing objections to an order of a magistrate in a nondispositive matter is set forth in Fed.R.Civ.P. 72(a). Upon objection, the district court may "modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a); see 28 U.S.C. § 636(b)(1)(A).

Defendants cannot claim that inclusion of the 1996 incidents will be prejudicial because in her petition, plaintiff alluded to the means by which Anderson discovered her 1994 complaint. The matter has been

---

**44.** Plaintiff's prayer for relief requests that the Court "(1) [e]nter a judgment pursuant to jury verdict(s) that the acts and practices complained of herein are in violation of the laws of the United States and the State of Kansas; (2)[p]ursuant to jury verdict, award plaintiff lost wages, including all lost fringe benefits and back pay, including without limitation, compensation differential and any lost benefits that would have otherwise been accorded

plaintiff absent the illegal discrimination; (3)[a]ward plaintiff, pursuant to jury verdict, compensatory and punitive damages; (4)[a]ward plaintiff the costs of this action, including the fees and costs of experts, together with reasonable attorney's fees; and (5)[g]rant plaintiff such other and further relief as this Courts finds necessary and proper." First Amended Complaint (Doc. # 25) at 10.

fully explored in discovery. While plaintiff has not shown that her 1996 activities are protected on the merits, the Court believes that the pretrial order should reflect her contentions, for what they are worth. Plaintiff's motion for reconsideration is therefore sustained.

## VIII. Motion To Amend Complaint

■ Plaintiff has filed a motion to amend her complaint to assert a cause of action under 42 U.S.C. § 1983. Specifically the amended complaint would allege that defendants acted under color of state law and that their "willful, knowing, and deliberate indifference to the injuries caused by their actions and omissions outlined above was a direct violation of plaintiff's constitutional rights under the Fifth and Fourteenth Amendments and 42 U.S.C. Section 1983." Motion For Leave To File Second Amended Complaint And Supporting Suggestions (Doc. # 64) filed July 21, 2000 at 12. Other than the above statement, plaintiff does not delineate her claims under the Fifth and Fourteenth Amendments.

■ Under Rule 15 of the Federal Rules of Civil Procedure, plaintiff may amend once as of right before a responsive pleading is served or within 20 days after service. Subsequent amendments are allowed by leave of court or by written consent of an adverse party. See Fed. R.Civ.P. 15(a). In this case, defendants have served a responsive pleading and opposed the amendment. Nevertheless, amendments should be "freely given when justice so requires." *Woolsey v. Marion Labs., Inc.*, 934 F.2d 1452, 1462 (10th Cir. 1991). "The decision to grant leave to amend a complaint, after the permissive period, is within the trial court's discretion, Fed.R.Civ.P. 15(a), and will not be dis-

turbed absent an abuse of that discretion." *Id.* The district court should deny leave to amend only when it finds "undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir.1993).

Plaintiff filed her original complaint on July 20, 1998 and she amended it on February 25, 1999. According to the scheduling order (Doc. # 37), the last date to file a motion to amend was May 17, 2000. Plaintiff requested and received an extension of time until July 22, 2000 to file her motion to amend, see Order (Doc. # 60) filed July 17, 2000, and then filed her motion on July 21, 2000. Although plaintiff offers no reason for the delay in bringing this claim, her motion is timely from a technical point of view.[45]

Defendants argue that granting plaintiff's motion will prejudice them, and that plaintiff's new claim is barred by the statute of limitations and fails to state a claim. See Defendant's Suggestions In Opposition To Plaintiff's Motion For Leave To File Second Amended Complaint (Doc. # 66) filed July 31, 2000. Defendants argue that they may be forced to file a motion to do discovery out of time, and that they may have to file a new motion to dismiss or for summary judgment out of time as well. It is unclear why defendant would be forced to extend discovery. It does not appear that plaintiff's new claims will involve significantly different factual issues or that further discovery will be required. The claims are merely new legal ones that rest on prior factual allegations.

■ Next, defendants argue that plaintiff's proposed claim is barred by the stat-

---

**45.** The Court recognizes that the parties stand on the eve of trial and that leave to amend is problematic from that standpoint. The responsibility for the delay rests with the Court, however, and not with plaintiff.

ute of limitations. Id. at 3. Under Kansas law, plaintiff had two years from the date of resignation to bring a cause of action under Section 1983. Since plaintiff resigned on August 8, 1996, a Section 1983 claim would have been timely if filed on or before August 8, 1998. Although the statute of limitations would bar plaintiff from filing a Section 1983 lawsuit at this time, plaintiff did file her first complaint on July 20, 1998. Under Fed.R.Civ.P. 15(c)(2), an amendment of a pleading relates back to the date of the original pleading when the claim asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading. Plaintiff's new claim arises out of the circumstances of her employment with defendants and her subsequent constructive discharge. The amendment would therefore relate back to plaintiff's original complaint.

Defendants also argue that plaintiff's claim is futile because plaintiff "does not identify the constitutional provision or federal statute upon which her Section 1983 claim is based." Id. at 4. Plaintiff's proposed amended complaint, however, does state that she is bringing suit under the Fifth and Fourteenth Amendments and Section 1983. Defendants' argument on this ground fails and the Court grants plaintiff leave to amend her complaint on or before April 30, 2001.

### IX. Motion For Leave To File Sur–Reply

■ In plaintiff's response to defendants' motion for summary judgment, she added 222 statements of uncontroverted fact. In their reply brief, defendants argue that the Court should strike these new facts because they are not supported by the record citations or admissible evidence. See Defendant City Of Leawood's Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 125) at 1–2. Plaintiff responds with a motion for leave to file a sur-reply. See Plaintiff's Motion For Leave To File Sur–Reply To Defendants' Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 128) filed March 6, 2001. Plaintiff argues that the Court should grant leave since defendants' reply brief asked the Court to strike plaintiff's new facts. Defendants respond that their reply does not warrant leave to file a sur-reply, that the sur-reply is unnecessary and would cause delay, and that if plaintiff is allowed to file a sur-reply, defendant should get to respond. See Defendants' Objections To Plaintiff's Motion For Leave To File Sur–Reply To Defendants' Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 129) filed March 13, 2001.

Under D. Kan. Rule 7.1, sur-replies are not ordinarily allowed by the Court. In this case, however, the Court has considered both defendants' reply brief and plaintiff's proposed sur-reply. Plaintiff correctly states that she was entitled to set forth additional facts in opposition to defendants' motion for summary judgment.[46] Defendants argue that plaintiff does not adequately support her statements of fact, as required by D. Kan. Rule 56.1, by referring with particularity to those portions of the record on which she relies. In evaluating the parties' factual statements, the Court has been careful to ensure that tendered facts are indeed supported by the record. See infra p. 52 n. 40. A further reply by defendants would duplicate this task and serve no function except further delay. The Court grants plaintiff leave to

---

**46.** Under D. Kan. Rule 56.1, "[i]f the party opposing summary judgment relies on any facts not contained in the movant's memoran-dum, that party shall set forth each additional fact in a separately numbered paragraph, supported by references to the record."

file her sur-reply but does not grant defendants leave to further reply.

IT IS THEREFORE ORDERED that the Motion To Dismiss (Doc. # 43) which defendants filed June 2, 2000 be and hereby is **OVERRULED** as moot.

IT IS FURTHER ORDERED that the Motion For Leave To File Second Amended Petition and Supporting Suggestions (Doc. # 64) filed July 21, 2000 be and hereby is **SUSTAINED**. The Clerk is directed to file plaintiff's amended complaint no later than April 23, 2001. By virtue of this opinion, however, the Court has determined that defendants are entitled to summary judgment on plaintiff's hostile environment claim in Count I, plaintiff's disparate treatment claim in Count II, and any claim that defendants retaliated against her for protected activity which occurred in 1996 (Count II). Those portions of plaintiff's second amended complaint are therefore resolved and defendants need not further respond to them. Defendants shall answer or otherwise respond to the remaining allegations no later than May 5, 2001.

IT IS FURTHER ORDERED that the Motion For Summary Judgment (Doc. # 87) which defendants filed on September 22, 2000 be and hereby is **SUSTAINED** in part. Summary judgment for defendants is granted as to (1) plaintiff's hostile work environment claim, as stated in Count I; (2) plaintiff's disparate treatment claims (Count II); and (3) plaintiff's retaliation claim based on allegations of protected activity in 1996 (Count II). Summary judgment is **OVERRULED** as to plaintiff's retaliation claim as to her 1994 complaint about Anderson (Count II), and plaintiff's constructive discharge claim (Count III).[47]

IT IS FURTHER ORDERED that plaintiff show cause in writing on or before May 5, 2001 why the Court should not enter judgment on the pleadings as to Count III, which purports to state an independently actionable claim for constructive discharge under Title VII.

Finally, the Court notes that plaintiff's new Count IV, which states her claim under 42 U.S.C. § 1983, is nothing more than a re-packaged version of plaintiff's claims under Counts I, II and III in her first amended complaint, as restated in the pretrial order and the second amended complaint. No valid purpose would be served by a requirement that the parties re-argue their summary judgment motions to address plaintiff's new claim under Section 1983 for hostile work environment, disparate treatment and retaliation. IT IS **THEREFORE FURTHER ORDERED** that plaintiff show cause in writing on or before May 5, 2001 why the rulings contained in the opinion should not apply with equal force to her claims under Section 1983. Defendants may respond on or before May 12, 2001.

IT IS FURTHER ORDERED that the Motion For Reconsideration Of The Pretrial Order (Doc. # 99) which plaintiff filed on November 8, 2000 be and hereby is **SUSTAINED**.

IT IS FURTHER ORDERED that Plaintiff's Motion For Leave to File Sur-Reply To Defendants' Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 128) which plaintiff filed on March 6, 2001 be and hereby is **SUSTAINED** and the clerk is ordered to file Plaintiff's Sur-Reply To Defendants' Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment. Defendants' motion to strike

---

47. At this point, the Court cannot find any meaningful distinction between Count I and Count III. Constructive discharge does not appear to be an independently viable cause of action, but rather a factor which bears on the remedy available to plaintiff if she prevails on her retaliation claim.

plaintiff's statement of uncontroverted facts contained in Defendant City Of Leawoods' Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. # 125) filed February 15, 2001 be and hereby is **OVERRULED.**